403 F.2d 291
 CONTINENTAL CASUALTY COMPANY, an Illinois corporation, Appellant,
v.
FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Appellee.
FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Cross-Appellant,
v.
CONTINENTAL CASUALTY COMPANY, an Illinois corporation, Cross-Appellee.
 A No. 9508.
 A No. 9509.
 United States Court of Appeals Tenth Circuit.
 November 1, 1968.
 
 1
 COPYRIGHT MATERIAL OMITTED Wesley H. Doan, Denver, Colo. (Yegge, Hall, Treece & Evans, Denver, Colo., on the briefs), for Continental Casualty Co.
 
 
 2
 Kenneth C. Groves, and V. G. Seavy, Jr., Denver, Colo., for Fireman's Fund Ins. Co.
 
 
 3
 Before MURRAH, Chief Judge, BREITENSTEIN, Circuit Judge, and DELEHANT, Senior District Judge.*
 
 
 4
 DELEHANT, Senior District Judge.
 
 
 5
 It is in order, preliminarily to identify the insurance corporation parties litigant, and their respective insureds; and to disclose, at least in a general and summarized way, the setting out of which the suit arose, whose determination in the trial court is presently under review. Thus, one may the better understand what alone is now directly before the court; for it is rooted in antecedent and presently terminated litigation in a state court, and, more remotely, in the historical framework of that earlier controversy.
 
 
 6
 From time to time, October 7, 1963 will be mentioned herein, after the manner of a time critical to this litigation. On that date the misadventure occurred which underlies this suit, as well as all antecedent litigation relevant hereto, infra.
 
 
 7
 Then, and for some time theretofore, one Harry Linch, as lessee, operated at 7201 Grandview Avenue, Arvada, Colorado, an oil and gasoline service station, characterized as a "Standard Service Station." The main building wherein he operated such station had been erected at an earlier date by one Victor C. Ries under a contractual agreement by him with Cook Bros. Oil Co., pursuant to plans therefor provided or approved by Standard Oil Company and The American Oil Company. But, as lessee, Harry Linch was at the critical time in the public and active management of the business of the service station. As a feature of such business, and from time to time therein, he purchased and acquired petroleum products for resale to his customers, and probably for incidental other purposes, from Petroleum Products Company, which, out of deference to counsel herein and to the trial court from which this case has come to this court, infra, and for the sake of brevity, is later herein ordinarily referred to as "Petco."
 
 
 8
 In the operation of his business, supra, Harry Linch, under the name and style of "Harry Linch Standard Service, 7201 Grandview, Arvada, Colorado," procured and had in operation from April 25, 1963 to April 25, 1964 (thus, inclusive of October 7, 1963) a garage liability policy of insurance issued to him, as "insured," by Fireman's Fund Insurance Company, a corporation, hereinafter referred to either as "Fund" or "The Fund", but generally as "Fireman's Fund," whose home office was in San Francisco, California, as insurer. A copy of such policy of insurance is attached to the AGREED STATEMENT OF FACTS duly executed and filed in the United States District Court for the District of Colorado in Case No. 66-C-90, Civil therein, out of which these appeals directly arise, infra, and constitutes a part of the record herein. In and by that policy, its coverage is defined clearly and adequately, but at a length rather too great to warrant its complete duplication or extended restatement herein.
 
 
 9
 Continental Casualty Company, an Illinois corporation, herein generally referred to as "Continental," under date of October 17, 1962, issued, effective from 12:01 standard time, October 1, 1962 until cancelled, its COMPREHENSIVE AUTOMOBILE LIABILITY POLICY NO. CCA 2659167, as insurer, to and in favor of THE PERMIAN CORPORATION AND/OR ANY OF ITS AFFILIATES AND SUBSIDIARIES, the latter explicitly including PETROLEUM TRANSPORT COMPANY (i. e. PETCO), as insureds. A copy of that policy is also attached to the AGREED STATEMENT OF FACTS in Case No. 66-C-90 in the United States District Court for the District of Colorado, infra. That policy included, among other coverage, the following insuring and conditioning language:
 
 
 10
 "INSURING AGREEMENTS
 
 1. Coverage A — Bodily Injury Liability
 
 11
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness, or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.
 
 Coverage B — Property Damage Liability
 
 12
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of any automobile.
 
 
 13
 * * * * * *
 
 
 14
 "III Definition of Insured
 
 
 15
 The unqualified word `insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured. * * *
 
 
 16
 * * * * * *
 
 
 17
 "4. Purposes of Use Defined
 
 
 18
 * * * * * *
 
 
 19
 (c) Use of an automobile includes the loading and unloading thereof."
 
 
 20
 Attention is also directed to the language applicable to coverage, and the limitation thereof, in (a) the AGREED STATEMENT OF FACTS, and (b) the MEMORANDUM OPINION AND ORDER, both Infra.
 
 
 21
 On or shortly before October 7, 1963, Harry Linch, doing business as Harry Linch Standard Service, 7201 Grandview, Arvada, Colorado, in the course of his business purchased and ordered from PETCO approximately 6000 gallons of liquid gasoline for transportation to, and delivery at, such service station by Petco on October 7, 1963. Petco was then, and for some years theretofore had been engaged in the business, among other things, of transporting and delivering to service stations petroleum products, including gasoline, and had theretofore made like transportation and delivery to the station just identified, though in quantities smaller than 6,000 gallons. At that station deliveries of such gasoline were usually made through its unloading and introduction by an employee of the seller thereof into underground storage tanks in the Linch station premises, and south of the service station building, from which tanks the fluid was thereafter, and as its use was required, removed by the station's gasoline pumps. Those underground tanks were equipped, as a part thereof, with a venting system, concerning which see the AGREED STATEMENT OF FACTS, infra.
 
 
 22
 At the time of, and during the interval of, the delivery by Petco to Harry Linch of such gasoline, one Chris Eugene Glunz, an employee of McBride Lighting Company, and acting in that capacity, was lawfully at the Linch station, and was engaged therein in the cleaning of lighting fixtures located in such premises. Thus present and engaged, he then considered it to be necessary for him to use, and he did use, the station's restroom facilities. Such use of the restroom facilities, at least partially concurred, in point of time, with the arrival at the station, and the unloading operations in respect, of the Petco truck and its gasoline cargo content. While engaged in his utilization of the station's restroom facilities, and being present personally in the restroom, Mr. Glunz ignited a match for the purpose of lighting a cigarette. An explosion and subsequent fire ensued, in consequence whereof, Glunz sustained physical injuries, vide infra.
 
 
 23
 After the foregoing explosion and fire, and prior to May 3, 1965, Chris Eugene Glunz, as plaintiff, filed in the District Court of Jefferson County, Colorado, a civil action against Harry Linch, Cook Bros. Oil Co., a Colorado corporation, The American Oil Company, a Maryland corporation, authorized to do and doing business in Colorado, Standard Oil Company, an Indiana corporation, authorized to do and doing business in Colorado, and Petroleum Transport Company, a Colorado corporation, being Civil Action No. 20151 in the District Court in and for the County of Jefferson, State of Colorado. Therein, Harry Linch was sued as the actual operator of the service station; Cook Bros. Oil Co. was sued as the alleged owner, on October 7, 1963, and as an entity which, on said date maintained and asserted an interest (beyond the exact knowledge of Mr. Glunz), of and in the real estate on which the service station was and is located, together with the Standard Service Station itself, its pumps, tanks, pipes, vents, and other facilities and equipment; The American Oil Company, in the capacity of the alleged corporate parent of Standard Oil Company, and Standard Oil Company, in the capacity of a corporate entity thus erected by the American Oil Company, were sued together, as corporations thus connected, which were allegedly engaged in the business of manufacturing, refining, distributing and selling petroleum products, including, but not limited to, gasoline, motor oils, greases and related by-products, in the course whereof, The American Oil Company distributed and sold its manufactured products within the State of Colorado, by and through Standard Oil Company, a division of The American Oil Company, and it was charged that such gasoline, motor oils and related petroleum products, so manufactured, were sold and offered for sale in the manner and form set out in the complaint in such suit at the Standard Service Station so operated by Harry Linch at 7201 Grandview, Arvada, Colorado, in furtherance of an arrangement generally asserted but without exact definition, in the complaint. In that action, Chris Eugene Glunz, therefore, appears to have undertaken to obtain a judgment for the entire amount of his alleged injuries and damages, said in the complaint to have been $100,000.00, together with interest and costs of suit, as against all of the several defendants, and each of them, and thus to impose the liability for such injuries upon each such defendant on the basis of his or its alleged articulation into, and participation in, the business so operated by Harry Linch.
 
 
 24
 The record before this court contains copies of the answers to that complaint of Chris Eugene Glunz, tendered separately by Harry Linch and by Petco, as defendants to such action.
 
 
 25
 Briefly recalled, the answer in that case of Harry Linch (in the so-called second defense thereof, wherein expressly his general answer to the complaint was made) admitted the corporate existence of Cook Bros. Oil Co., and its ownership of, and possession and assertion of an interest in, the foregoing Standard Service Station in Arvada, the real estate whereon it was located, and its pumps, tanks, pipes, vents and other equipment; the corporate origin in separate other states, and the Colorado domestication and engagement in business in Colorado, of each of The American Oil Company and Standard Oil Company; their intercorporate relationship, supra, and their engagement in the manufacture, refining, distribution and sale in Colorado of petroleum products; the initial erection on the service station site by The American Oil Company, pursuant to plans prepared and devised by it, of the Standard Service Station located thereon, and the sale thereafter at such station by The American Oil Company, through Standard Oil Company, of their petroleum products, thereby retaining and exercising a control over such premises, which admission, however, is expressly made with the reservation of a denial by the pleader that such acts were performed by The American Oil Company and Standard Oil Company "pursuant to and in accordance with a valid and effective lease or supplemental agreement;" that Petco was and is a Colorado corporation authorized to do business in Colorado, and "on October 7, 1963 and at all times thereafter in such complaint complained of, was engaged, among other activities, in transporting, hauling, delivering and unloading, in its transport trucks the products of the defendants, The American Oil Company and Standard Oil Company, upon the order, direction and mandate of the defendants, Cook Bros. Oil Co. and/or Harry Linch, into the storage tanks and other facilities situate on the Standard Service Station hereinabove described," to which admission, however, a reservation or exception was asserted by the pleader's explicit denial that any of the products of the defendant, The American Oil Company and Standard Oil Company were transported, hauled, delivered, or unloaded at this defendant's (i. e. Harry Linch's) order, direction or mandate, into the storage tanks or other facilities situate on the Standard Service Station described in the complaint, which emphasized denial, in the light of the admission to which it was subjoined may, not inappropriately, be regarded as somewhat obscure in respect of its precise thrust; the personal residence in Colorado, and the Colorado citizenship of Chris Eugene Glunz, and his presence on October 7, 1963, and at all times pertinent to the then suit, on the premises of the above described Standard Service Station, as a business invitee of all of the defendants in said suit except Petco, though with the knowledge of Petco, to which admission, however, Harry Linch expressly interposed a qualifying denial that Chris Eugene Glunz "was a business invitee of" Harry Linch "on October 7, 1963 or at any other time pertinent hereto." And in such second defense to the complaint, the defendant Harry Linch, in his answer denied generally all averments of the complaint of Mr. Glunz not therein specifically answered. In such answer's second defense, Harry Linch also made a generalized admission of paragraphs 12, 14 and 19 of the Glunz complaint "except as otherwise alleged herein." But those three paragraphs of the complaint are merely the incorporation by reference into as many separately stated and numbered causes of action in the complaint, of GENERAL ALLEGATIONS of the complaint set forth preliminary to, and, through such incorporation effecting economy of verbiage, in the statement of what the pleader in Mr. Glunz' complaint appears to have conceived as separate bases whereon to rest his single demand for damages, finally set out in a prayer common to all such causes of action.
 
 
 26
 In Harry Linch's answer, he also, (a) by way of a first defense, alleged that the complaint failed to state a claim against the defendant, Harry Linch, "upon which relief can be granted to the plaintiff herein;" (b) by way of a third defense, alleged that if the plaintiff were injured in any of the manners stated in the complaint, such injuries, if any, were the direct and proximate result of the sole or contributory negligence of the plaintiff; (c) by way of a fourth defense, alleged that if the plaintiff were injured in any of the manners stated in the complaint, such injuries, if any, were the direct or proximate result of an unavoidable accident or Act of God; and (d) by way of a fifth defense, alleged that if the plaintiff were injured in any of the manners stated in the complaint, such injuries, if any, were the direct or proximate result of plaintiff voluntarily assuming a risk of which he had full knowledge and appreciation.
 
 
 27
 At this point it is mentioned that, after the institution of Civil Action No. 20151, in the District Court of Jefferson County, Colorado, by the plaintiff therein, Chris Eugene Glunz, against the defendants thereto already identified herein, Victor G. Ries, the contractor who, as a building contractor, erected the Standard Service Station building was brought into the action as an additional, or third party, defendant at the behest, and upon the initiative, of the defendant therein, Harry Linch. It may be added, however, that, upon the record before this court, no issue or controversy in respect of Victor G. Ries as a party litigant hereto, appears to have been tendered and preserved for the present consideration or determination of this court.
 
 
 28
 The separate answer in the case of Chris Eugene Glunz, plaintiff, vs. Harry Linch, et al, being CIVIL ACTION NO. 20151, in the District Court in and for the County of Jefferson, State of Colorado, filed by Petroleum Transport Company, i. e. Petco, as a defendant therein, was and is brief. That circumstance is measurably, though not entirely, attributable to the circumstance that, of the four separate and numbered alleged causes of action in the complaint of the plaintiff, Chris Eugene Glunz, only one, namely, the THIRD, is explicitly directed against that defendant. It is, of course, readily recognized that, in the GENERAL ALLEGATIONS, in eleven consecutively numbered paragraphs, wherewith the separate and numbered alleged causes of action of the complaint were and are premised, the plaintiff had made many allegations identifying and describing the several defendants to that suit, and attributing to one or more of them either historical information or conduct, asserted to have relevance to the case. In that behalf, the following observations are separately made touching each of those general allegations, excepting that numbered 6. In item 1 of the general allegations, the plaintiff, Glunz, alleged the corporate status, domicile and business of the defendant Cook Bros. Oil Co., by way of relating that defendant to the operation of the Standard Service Station herein mentioned, and to the occurrence of October 7, 1963. In item 2 of the general allegations, the plaintiff, Glunz set out the corporate domicile and Colorado domestication, and the right to transact business in Colorado, of each of the two corporate defendants identified as The American Oil Company and Standard Oil Company, and their corporate relationship each to the other, as already mentioned herein; and that item was and is followed by item 3 wherein were alleged the engagement of those two corporations in the business of manufacturing, refining, distributing and selling petroleum products (The American Oil Company, in such distribution and sale within the state of Colorado allegedly acting by and through Standard Oil Company, and the sale of such products allegedly being carried on, among other places, at such Standard Service Station). In item 4 of the general allegations, the plaintiff, Glunz, asserted that, in accordance with a lease agreement dated February 9, 1962 and recorded at an identified page of the records of the Clerk and Recorder of Jefferson County, Colorado, the defendant, The American Oil Company, according to plans and specifications by it prepared, devised, arranged, adopted and approved, erected and built the Standard Service Station already mentioned herein, and thereafter and until October 7, 1963, offered for sale and sold at such Standard Service Station its products, by and through Standard Oil Company, and "by virtue thereof, remained in full possession and control of said lots and parcels of land, the Standard Service Station thereon erected and its facilities, and continued to have under its exclusive control, management, operation, maintenance and possession all of the buildings, tanks, pumps, lines, pipes, vents and other devices and equipment therein situate, all in accordance with the terms and provisions of the lease agreement hereinabove described, as supplemented, amended, extended, complemented and continued by virtue of a certain agreement in writing referred to, and incorporated in, and made a part of such lease but not otherwise published, recorded, circulated or disclosed." In item 5 of the general allegations, the plaintiff Glunz alleged that at all pertinent times, and, particularly, on October 7, 1963, Harry Linch was in the actual custody of the premises, the Standard Service Station and the equipment and facilities therein and thereto attached as the operator thereof, pursuant to and in accordance with a license, permission or authority from the defendants, The American Oil Company, Standard Oil Company, and Cook Bros. Oil Co., and, for and on their behalf, did sell and offer for sale to the general public the products manufactured, refined, sold and distributed as hereinbefore referred to. In Item 7 of the general allegations, the plaintiff Glunz alleged that at all pertinent times he was, and at the time of his complaint remained and was, a resident and citizen (sic) of the city of Englewood, Colorado, and was on October 7, 1963, and at all other pertinent times, a business invitee of all of the defendants, save and except the defendant Petroleum Transport Co., upon the premises and its facilities hereinabove described, but whose presence upon said premises was known to the defendant Petroleum Transport Co. In item 8 of the general allegations, the plaintiff Glunz alleged "that at or about two o'clock P.M. on October 7, 1963 he entered the Standard Service Station, and, with the consent and approval of all of the defendants, began to use the restroom therein kept and maintained for the use and accommodation of the defendants' customers and business invitees, when, suddenly, unexpectedly, and without warning, an explosion and subsequent fire occurred therein as the direct and proximate result of which he suffered the many serious, permanent and disabling injuries hereinafter detailed;" that the explosion and subsequent fire, and the injuries of which the plaintiff now complains were the direct and proximate result of the wrongful, unlawful, negligent, careless and reckless acts and actions of the defendants and each of them, acting separately and in concert with each other. In item 9 of the general allegations, the plaintiff Glunz alleged in detail his claimed injuries and the particulars thereof. In item 10 of the general allegations, the plaintiff Glunz, in general terms, alleged his subjection in consequence of such injuries to expenses for medicine, medical items, hospitalization, physicians' and surgeons' fees, nurses' hire, drugs and the like for treatment and attempted cure, to his great financial damage and loss, and averred, on information and belief, that some of his injuries were and are permanent, and had prevented, and would thereafter prevent, him from attending to his usual and daily occupation. And in item 11 of the general allegations, the plaintiff alleged that by reason of his alleged injuries he had been damaged in the sum of one hundred thousand ($100,000.00) dollars.
 
 
 29
 In item 6 (at this point herein adverted to out of its numerical sequence in the complaint) of the general allegations of the complaint of the plaintiff Glunz, he made in a single sentence the following allegations against the defendant in that suit, Petroleum Transport, Co. i. e. Petco:
 
 
 30
 "That the defendant, Petroleum Transport Co., at all times pertinent hereto, was and is a Colorado corporation, organized and existing under and by virtue of the laws of the State of Colorado to do business within the state under the name and style of `Petco,' with its principal place of business at 1700 Broadway in the city and county of Denver, State of Colorado, and which, on October 7, 1963, and at all times hereinafter complained of, was engaged in the transporting, hauling, delivering and unloading, in its transport trucks, the products of the defendants, The American Oil Company and Standard Oil Company, upon the order, direction and mandate of the defendants, Cook Bros. Oil Co., and/or Harry Linch into the storage tanks and other facilities situate on the Standard Service Station hereinbefore described."
 
 
 31
 Briefly reflected, the answer of Petco to the complaint of the plaintiff Glunz, in Civil Action No. 20151 in the District Court in and for the County of Jefferson, State of Colorado, duly filed in that action, (1) as to paragraphs 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11, supra, of the general allegations in the complaint of the plaintiff Glunz therein, disclaimed Petco's possession of knowledge or information sufficient to form a belief as to their truth, and, therefore, denied the allegations of those paragraphs; (2) admitted the allegation of paragraph (6) of such general allegations, as quoted supra; (3) as to the first, second and fourth causes of action set out in the complaint in said action in the state court of Colorado filed therein in by its plaintiff Glunz, none of which counts undertook to state a cause of action against Petco, initially and correctly declared its position that each of said first, second and fourth counts failed to state a claim for relief against Petco; and, thereafter, asserted that "if it could be considered that they do in anywise state a claim for relief against this defendant," i. e. Petco, "this defendant denies every allegation thereof and incorporates herein and adopts by reference his (sic) affirmative defenses to the plaintiff's third cause of action as though set forth herein word by word," (vide infra); made Petco's answer to the third cause of action of the complaint in said Civil Action No. 20151 wherein, through paragraphs 17 and 18 of that complaint, the claim of its plaintiff Glunz against Petco, and its attempted articulation into the causation of the explosion and subsequent fire, had been asserted. It is here observed that in asserting in his complaint his claim for damages against Petco — and Petco only — Glunz in paragraphs numbered 17 and 18 of his complaint had alleged in this language that:
 
 
 32
 "17. The allegations and averments made and contained in paragraphs 1 through 11, inclusive, hereinbefore set forth, are hereby adopted to the same intent and purpose as if again restated and realleged.
 
 
 33
 "18. That, at or about 1:30 p. m., on October 7, 1963, this defendant" (elsewhere clearly disclosed as meaning Petco) "upon the order of and under the direction, supervision and instruction of the other defendants, negligently, carelessly, recklessly and wrongfully began the unloading, emptying, discharging and transferring of large volumes of gasoline, to-wit: six thousand (6,000) gallons from its transport trucks into the leaky, faulty, unlawful, defective, broken, deteriorated, worn and inadequate installations, storage tanks, mains, lines, vents and other conduits situate at the above-described Standard Service Station; that said unloading, emptying, discharging and transferring continued, uninterruptedly, until 2 p. m. on said date, and, as the direct result thereof, large quantities of gas and gasoline vapors were permitted to escape, which combined with large quantities of gas and gas vapors then being permitted to escape from the facilities of the station and accumulate, collect and gather in and about the premises, the station and the rest room therein contained."
 
 
 34
 Responding to that third cause of action of the complaint in the state court of the plaintiff Glunz, therein, the defendant, Petco, in that civil action, as to the quoted paragraphs 17 and 18 of the complaint therein, pleaded in this language:
 
 
 35
 "1. In answer to paragraph 17 of the plaintiff's third cause of action," (sic) "the defendant incorporates herein and adopts by reference his" (sic) "answers to the allegations and averments made and contained in paragraphs 1 through 11, inclusive, of the plaintiff's general allegations, as though set forth herein word by word."
 
 
 36
 "2. In answer to Paragraph 18 of the plaintiff's third cause of action, the defendant" (sic) "denies the same."
 
 
 37
 Here it is noted in passing that the pleader's allusions in the most recently quoted language to paragraphs 17 and 18 "of the plaintiff's third cause of action" is inexact. They are not paragraphs 17 and 18 "of the plaintiff's third cause of action," but are, rather, those numbered two paragraphs of the entire complaint of the plaintiff Glunz therein, and they are the only numbered paragraphs contained in that complaint's special reference to his third cause of action.
 
 
 38
 Finally, in its answer in that Civil Action No. 20151 in the state court, Petco, as a defendant to that action alleged:
 
 
 39
 first, "that the plaintiff's complaint failed to state a claim
 upon which relief can be granted;"

secondly, "that the injuries and damages sustained by the plaintiff"
 i. e. Chris Eugene Glunz, "if any, were incurred
 as a result of the plaintiff's own sole or contributory
 negligence;"

thirdly, that such injuries and damages, if any, "were incurred
 as a result of the negligence of some person or persons
 other than" Petco, when Petco "had no control or right
 of control and for whom" Petco "had no responsibility
 for the action of such person or persons;"

fourthly, that such injuries and damages, if any, "were incurred
 as a result of the negligence of the plaintiff," Glunz,
 "concurring with the negligence of some person or persons
 other than" Petco "the plaintiff and other unknown
 person or persons over whom" Petco "had no
 right, duty, or obligation to control, and which negligence
 proximately caused the injuries and damages of
 the plaintiff," Glunz;

fifthly, that such injuries and damages, if any, "were incurred
 as a result of any" (sic) "unavoidable accident;" and

sixthly, that such injuries and damages, if any "were incurred
 as a result of the plaintiff's unreasonable assumption
 of risk of harm and injury when he knew or should
 have known of the condition which existed on the premises
 where he allegedly sustained his injury or injuries
 and his unreasonable and reckless failure to heed such
 conditions."
 
 
 40
 Finally, Petco, as an answering defendant in Civil Action No. 20151 in the state court concluded its answer to the complaint of the plaintiff therein, Glunz, with a prayer for judgment in behalf of Petco and against the plaintiff Glunz, and for its costs and for general equitable relief.
 
 
 41
 It is readily apparent that the foregoing extended gleaning from the pleadings in Civil Action No. 20151 in the state court is limited to the contents of the complaint therein of the plaintiff, Chris Eugene Glunz, on the one hand, and, on the other hand, of the separate answers of the defendants therein, (a) Harry Linch, and (b) Petco. The record before this court does not, and need not, disclose, from the files and record in that earlier state court litigation, or otherwise, information from which a comprehensive and complete reflection of its pleadings might be assembled. For the ensuing litigation in the United States District Court for the District of Colorado, out of which the appeal and cross-appeal to this court now considered have directly and entirely arisen, is rooted in the issues made upon the complaint and the separate answers of the defendants Harry Linch and Petco in the earlier state court litigation, and the submission and determination in that court of those issues. That submission and determination, so far as they appear to possess present pertinence, will now be adverted to briefly. Such abbreviation has been rendered both possible and appropriate by the course in the United States District Court of the litigation arising out of the state court suit, but subsequently initiated and conducted in the United State District Court for the District of Colorado.
 
 
 42
 The record before this court on this appeal, and cross appeal, discloses clearly that in the state court action of Glunz v. Linch et al. supra, the defense of the defendant, Harry Linch, was undertaken and presented in the state court by his insurer, Fireman's Fund; and that in such state court action, the defense of the defendant, Petco, was undertaken and presented in the state court by its insurer, Continental.
 
 
 43
 On May 3, 1965, and after the institution by Chris Eugene Glunz of his action in the state court against Harry Linch and others, supra, and acting on the basis of information touching the existence and supposed coverage of Continental's policy of insurance in favor of Petco (among other beneficiaries) supra, Harry Linch, acting by and through his attorney, Kenneth C. Groves (representing Harry Linch under employment by his insurer, Fireman's Fund), by a written letter addressed and transmitted to the Claims Manager in Denver, Colorado, of Continental, advised Continental of the existence of the claim of Glunz and, upon the asserted premise that in the circumstance, Harry Linch was entitled to coverage, primary in character, as an additional insured under Continental's policy in favor of Petco, made demand upon Continental to assume the defense of Harry Linch in the state court action, and to pay any judgment rendered against Harry Linch, and costs, attorney's fees, and all other litigation expenses. As of May 6, 1965 (in the asserted absence of the Claims Manager of Continental) response was made to that communication by one William G. Kemme, Claim Supervisor of Continental, declining the request made in behalf of Harry Linch. On the following day, May 7, 1965, the said Kenneth C. Groves addressed an acknowledgment and reply to William G. Kemme, claim supervisor of Continental, warning him and, through him Continental, that the rejection in behalf of Continental of the request theretofore made of it (immediately, supra) was not accepted, and of the imminence of suit against Continental for protection of Harry Linch. On May 13, 1965, the claim manager of Continental, by letter to Kenneth C. Groves, explicitly confirmed Continental's earlier denial of liability so made in its behalf by William G. Kemme. (This court observes the allegation of paragraph 19 of the complaint in the United States District Court for the District of Colorado identifying May 17, 1965 as the date of the rejection of Kenneth C. Groves' letter of May 7, 1965. That disparity in date is regarded as immaterial.)
 
 
 44
 Thereupon, Fireman's Fund proceeded with the defense of Harry Linch in the state court case. Trial was had of that case in the District Court of Jefferson County, Colorado. While the limited references, in the record of this court upon these appeals, to the course of the trial in the state court, are inadequate to support an informed and categorical declaration here touching the disposition in the state court of the issues in the state court (a) as between the plaintiff therein, Glunz, and each of the several defendants thereto, or (b) as between any of the several defendants thereto, it is made satisfactorily to appear that in that state court action,
 
 
 45
 (1) a directed verdict of dismissal of the claim of the plaintiff Glunz therein against the defendant, Standard Oil Company of Indiana, therein was ordered and entered;
 
 
 46
 (2) a directed verdict of dismissal of the claim of the plaintiff Glunz therein against the defendant, Petroleum Transport Company, i. e. Petco, was ordered and entered;
 
 
 47
 (3) after the trial had proceeded to a point where all of the testimony had been taken, the defendant, Harry Linch, permitted a judgment to be entered against him in the sum of $5,000.00, which judgment was entered therein on January 13, 1966 against him by virtue of his stipulation and agreement;
 
 
 48
 (4) on January 14, 1966, such judgment was paid in full and satisfied. Such payment of the judgment, inclusive of costs in the action was actually made by Fireman's Fund in behalf of Harry Linch. Fireman's Fund, in addition to $5,000.00 (the amount of said judgment) incurred obligation for $6,946.57 for court costs and attorney's fees for services rendered in that case;
 
 
 49
 (5) Certificate of Satisfaction was entered in said state court on February 8, 1966.
 
 
 50
 Before the entry of such judgment, counsel for Continental at Denver, Colorado, were, by counsel for Fireman's Fund, advised of the course thus far of the litigation in the state court, including the then contemplated entry of judgment for $5,000.00 against Harry Linch, and given opportunity to object thereto, or otherwise participate therein (see more detailed reflection in the AGREED STATEMENT OF FACTS, infra), which tender was rejected. Promptly thereafter, in behalf of Harry Linch, and particularly of Fireman's Fund, and on January 14, 1966, Kenneth C. Groves, as attorney for said Linch and Fireman's Fund, addressed and transmitted to Wesley H. Doan, Esq., Denver, Colorado, counsel herein for Continental, a letter and therein, inter alia, advised him briefly of the course of the antecedent litigation, demanded that Continental pay the judgment and "ancillary costs" within the execution period of ten days, and signified the intention of Fireman's Fund, unless such payments were made, to institute suit on account thereof against Continental. That requested payment was not made. The action in the United States District Court for the District of Colorado, being case numbered 66-C-90 Civil, ensued, the complaint therein having been filed during February, 1966. The instant appellate proceeding involves an appeal and a cross-appeal taken from the judgment made and given in such case numbered 66-C-90 Civil. The issues in that case, as made by the pleadings in it, are next disclosed. Fireman's Fund Insurance Company, as plaintiff, and Continental Casualty Company, as defendant, were and are the only parties to that case, and, on appeal, are the only parties to this appellate proceeding.
 
 
 51
 In its complaint in the case just mentioned, Fireman's Fund alleged the existence of a controversy in amount exceeding $10,000.00 exclusive of interest and costs; the existence of Fireman's Fund as a California corporation, and its authorization to do, and actual doing of, business in Colorado, at all times pertinent to the suit; and the existence of Continental as an Illinois corporation, and its authorization to do, and actual doing of, business in Colorado at all times pertinent to the suit. It is next alleged therein that, prior to October 7, 1963 (thereafter in such complaint generally referred to as "date of accident") Continental issued a policy of insurance to Petco, in such complaint identified as a Colorado corporation known as Petroleum Transport Company, which policy was in full force and effect on the date of accident; and averred, on information and belief, that such policy of insurance provided, inter alia, (a) that Continental, as insurer, agreed with Petco, its assured, in consideration of the payment of premiums and in reliance upon the statement in the declaration, and subject to the limits of liability, conditions, exclusions and other terms of said policy, that the insurer would pay on behalf of the insured, all sums which the insured became obligated to pay as damages because of bodily injury, sickness or disease, including death resulting therefrom, sustained by any person, and caused by any accident arising out of the ownership, maintenance or use of an automobile, as the term automobile is therein defined; and the insurer further agreed to defend any suit against the insured seeking damages on account thereof; (b) that the unqualified word, "insured," included the named insured, and also included any person while using the automobile, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with its permission; and (e) that the use of an automobile included the loading and unloading thereof.
 
 
 52
 In its complaint just mentioned, Fireman's Fund further alleged that (d) on the date of accident Petco was the lessee of a tractor-trailer, which, at the time of said accident, was being operated by its agent, servant and employee, and within the regular course of his employment; (e) that on the date of accident, Petco hauled, through its agent, servant and employee, certain petroleum products, to-wit, approximately 6,000 gallons of liquid gasoline, American Oil Company brand, premium and regular, to a Standard Service Station located at 7201 Grandview Ave., Arvada, Colorado, then being leased and operated under the sole and exclusive control of Harry Linch; (f) that at the time of the accident, Chris Eugene Glunz was then and there present on the premises of the Standard Service Station located at 7201 Grandview Ave., Arvada, Colorado, for the purpose of performing certain business services for Harry Linch; (g) that, just prior to the time of the accident, Petco, through its agent, servant and employee, and at the direction of, and with the permission of, Harry Linch, commenced to unload the liquid gasoline thus mentioned and described into the underground storage tanks located on said premises.
 
 
 53
 In its complaint so mentioned, Fireman's Fund then alleged, (h) that during the course of said unloading operation, and as a result thereof, a quantity of gasoline fumes or vapors was created, which fumes or vapors entered the service station building where Chris Eugene Glunz was then present; (i) that, during the continuance of such unloading operation, such fumes or vapors, were ignited, and an explosion occurred from which Chris Eugene Glunz sustained certain personal injuries as a result thereof; and (j) that the tractor-trailer thus described was scheduled or otherwise designated in, and covered by, the policy of insurance described in paragraph 3 (sic) of the complaint, (which allusion to paragraph 3, is by this court believed to be a pleader's mistake in the light of the actual description of the policy in paragraph 4, rather than paragraph 3, of the complaint).
 
 
 54
 In its complaint so mentioned, Fireman's Fund proceeded to allege (k) that some time before May 3, 1965, Chris Eugene Glunz commenced in the District Court in and for Jefferson County, Colorado, Civil Action No. 20151 to recover the sum of $100,000.00 in damages allegedly resulting from his personal injuries above referred to, from and against, among others, Harry Linch; (1) that Harry Linch undertook the defense of such action through Fireman's Fund which, as theretofore in such complaint averred, had issued its policy of general liability insurance to Harry Linch, which was in effect on the date of accident; (m) that some time before May 3, 1965, Harry Linch, through Fireman's Fund, discovered that Continental had in full force and effect its policy of insurance to Petco, hereinbefore referred to, and that the coverage provided thereunder was primary in connection with the suit in the District Court in and for Jefferson County, Colorado, brought by Chris Eugene Glunz as plaintiff, and against Harry Linch and others as defendants, supra; that as a result thereof, on May 3, 1965 a letter was sent to Continental (a copy whereof is set out at length as an exhibit to, and incorporated by reference into, Fireman's Fund's complaint) which, in substance, stated that Harry Linch was entitled to protection as an insured under the policy issued to Petco by Continental, and demanding that Continental assume the defense of Harry Linch, or, alternatively, pay any judgment rendered against him, including court costs, and all other costs, expenses and attorney's fees incurred as a result of, and in the defense of, said action; (n) that said demand was rejected on May 6, 1965 by Continental without reason or explanation; (o) that on May 7, 1965 Continental was again sent a letter (a copy whereof is set out at length as an exhibit to, and incorporated by reference into Fireman's Fund's complaint) whereby Continental was advised of the necessary action to enforce the terms and coverages contained in said policy, which would be timely instituted if the requested assumption of Harry Linch's defense were not made, and whereby Continental was further advised that Fireman's Fund looked to Continental for full indemnification for any judgment rendered against Harry Linch, and all costs expended in the defense of such suit, including attorney's fees; (p) that the tender of defense, last hereinbefore described, was, by Continental, again refused on May 17, 1965; (q) that, as a result of Continental's refusal, Harry Linch, through Fireman's Fund, was required to continue the defense of Harry Linch against the suit of Chris Eugene Glunz, including the trial of that action; (r) that the trial of such action resulted in judgment against Harry Linch in the amount of $5,000.00, which judgment was satisfied by Harry Linch through Fireman's Fund, and copies of such satisfaction and of certification were attached as exhibits to, and by reference made a part of the complaint of Fireman's Fund; and that, by the terms of its policy of insurance in favor of Harry Linch, Fireman's Fund was and is subrogated to Harry Linch's rights against Continental; and (s) that, before the entry of said judgment, agents and attorneys for Continental were advised of the progress of the trial, and given an opportunity to object to any action taken by Harry Linch through Fireman's Fund, and, further, to take any action on its own behalf which it deemed necessary or prudent; that Continental, through its agents and attorneys, made no objection and took no action with respect to the judgment which was subsequently rendered; that, in a letter dated January 14, 1966, of which a copy is attached to and made a part of the complaint of Fireman's Fund, said Fireman's Fund extended to Continental a period of time equivalent to the statutory stay of execution within which to pay such judgment to Chris Eugene Glunz, but there was no response to such letter, and Continental failed to satisfy such judgment as therein requested by Fireman's Fund; (t) that, as a result of Continental's failure, neglect and refusal to assume and meet its obligations under the terms and provisions of its policy, and to assume and accept full responsibility for the defense of Harry Linch in the action against him brought in the state court by Chris Eugene Glunz, Fireman's Fund has incurred special damages itemized as follows:
 
 
 55
 Miscellaneous itemized expenses incident to the litigation
and the preparation for, and conduct of the trial inclusive
of court costs and reporting services, aggregating $ 546.57
Lynch & Groves, attorneys' fee 6,400.00
Judgment (supra) 5,000.00
 __________
 TOTAL $11,946.57
 
 
 56
 And in a concluding averment in its complaint, Fireman's Fund, obviously repetitively, but probably by way of summary, asserted that Harry Linch had coverage under the policy of Continental on the date of accident; that Continental's refusal and neglect to assume and meet its obligation thereunder has breached its contract, to the damage of Fireman's Fund, which was and is subrogated to the rights of Harry Linch in the amount of $11,946.57.
 
 
 57
 Finally, in its complaint, the plaintiff Fireman's Fund, prayed for judgment against the defendant Continental "in the amount of $11,946.57, plus costs of this action, and interest from the date of filing hereof." (Which, obscurely stamped in the present record of that complaint, appears to be February 10, 1966, but may be February 18, 1966.)
 
 
 58
 In the foregoing summary of Fireman's Fund's complaint, this court has undertaken to reflect the substance only of the allegations of such complaint, and thereby, with a fair measure of accuracy, to abbreviate. So doing, it has attempted to preserve the sequence in which the subject matter of the complaint is set out therein. Moreover, it has separated items of allegation by the intrusion of parenthesized letters of the alphabet rather than by the use of numerals for that purpose in the manner of the complaint.
 
 
 59
 To that complaint of the plaintiff Fireman's Fund, and apparently on February 28, 1966, the defendant Continental filed its answer which is now summarized.
 
 
 60
 First, by the categorical admission of the allegations of the complaint's paragraphs numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 18 and 19, Continental, in its answer admits such complaint's assertion (1) the presence of a controversy exceeding the sum of $10,000.00 exclusive of interest and costs; (2) the alleged corporate domicile in California and authorization to do, and doing of, business in Colorado, of Fireman's Fund; (3) the alleged corporate domicile in Illinois and authorization to do, and doing of, business in Colorado, of Continental; (4) Continental's issuance theretofore and before October 7, 1963, the "date of accident" of a policy of insurance to a Colorado corporation, known as Petroleum Transport Corporation, thereafter in the complaint identified as "Petco," which policy was in force on the date of accident; (5) that the policy of insurance last mentioned provided, inter alia, that Continental, as insurer, agreed with Petco, as insured, in consideration of the payment of premiums and in reliance upon the statement in the declaration and subject to the limits of liability, conditions, exclusions and other terms of said policy, that the insurer would pay on behalf of the insured, all sums which the insured became obligated to pay as damages because of bodily injury, sickness or disease, including death resulting therefrom, sustained by any person and caused by any accident arising out of the ownership, maintenance or use of an automobile, as the term automobile is therein defined; and the insurer further agreed to defend any suit against the insured seeking damages on account thereof; (6) that said policy of insurance further provided that the unqualified word, "insured," included the named insured and also included any person while using the automobile, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile was and is by the named insured or with his permission; (7) that said policy of insurance further provides that the use of an automobile includes the loading and unloading thereof; (8) that on the date of the accident Petco was the lessee of a tractor-trailer which was, at the time of said accident, being operated by its agent, servant and employee, and within the regular course of his employment; (9) that, on the date of the accident, Petco hauled, through its agent, servant and employee, certain petroleum products, to-wit, approximately 6,000 gallons of liquid gasoline, American Oil Company brand, premium and regular, to a Standard Service Station located at 7201 Grandview Ave., Arvada, Colorado, then and at that time being leased and operated under the sole and exclusive control of Harry Linch; (10) that, at the time of the accident, Chris Eugene Glunz was then and there present on the premises of Standard Service Station, 7201 Grandview Ave., Arvada, Colorado, for the purpose of performing certain business services for said Harry Linch; (11) that, just before the time of the accident, Petco, through its agent, servant and employee, and at the direction, and with the permission of Harry Linch, commenced to unload the liquid gasoline theretofore hauled to such Standard Service Station, supra, into the underground storage tanks located on said premises; (13) that the tractor-trailer herein described was scheduled, or otherwise designated in or covered by the policy of insurance, so issued by Continental to Petroleum Transport Company, herein referred to as Petco, which was in full force and effect on the date of the accident; (14) that, some time prior to May 3, 1965, the said Chris Eugene Glunz commenced an action in the District Court in and for the county of Jefferson, State of Colorado, entitled Civil Action No. 20151 to recover the sum of $100,000.00 in damages allegedly resulting from the personal injuries referred to above, from and against, among others, Harry Linch; (15) that the said Harry Linch undertook the defense of said action through Fireman's Fund, plaintiff herein, Fireman's Fund having issued its policy of general liability insurance to the said Harry Linch, and which policy was in effect on the date of the accident; (18) that, on May 7, 1965 — and subsequent to the transmittal of a letter of similar general import sent to Continental on May 3, 1965, whose demand had been rejected by Continental on May 6, 1965 (vide infra) — Continental was again sent a letter of which a copy is attached to and made a part of Fireman's Fund's complaint in Case numbered 66-C-90 in the United States District Court for the District of Colorado, wherein Continental was advised of the necessary action to enforce the terms and coverage contained in its policy of insurance to Petco, which would be instituted at the proper time if assumption of Harry Linch's defense were not made by Continental; in the alternative whereto Continental was further advised that Fireman's Fund looked to Continental for full indemnification for any judgment rendered against Harry Linch, and all costs expended in the defense of such suit, including attorney's fees; and (19) that the tender of defense described in the last preceding clause hereof was "again" refused by Continental on May 17, 1965.
 
 
 61
 The allegations in the complaint of Fireman's Fund, the plaintiff, thus identified in the last preceding, and extended, paragraph hereof are, therefore, to be considered as admitted in their entirety by Continental in its answer to that complaint.
 
 
 62
 Secondly, by Continental's express denial in its answer of the allegations of paragraphs 12, 17, 20 and 24 of the plaintiff, Fireman's Fund's complaint, Continental is to be understood as denying (12) that, during the course of the unloading operation on the date of the accident, a quantity of gasoline fumes or vapors was created, which fumes or vapors entered the service station building, where said Chris Eugene Glunz was then present; further, and during the continuance of said unloading operation, said fumes or vapors were ignited, and an explosion occurred from which the said Chris Eugene Glunz, sustained certain personal injuries as a result thereof; (17) that the demand upon Continental by letter of Kenneth C. Groves, bearing date May 3, 1965, of which letter a copy is attached to, and made a part of, such complaint, which letter stated in substance that Harry Linch was entitled to protection under the policy issued to Petco by Continental, and demanded that Continental assume the defense of Harry Linch, or, alternatively, pay any judgment rendered against Harry Linch, including court costs and all other costs, expenses and attorney's fees, incurred as a result of, and in defense of the action, was rejected by Continental on May 16, 1965 without reason or explanation (emphasis added); (20) that Harry Linch, through Fireman's Fund, as a result of Continental's refusal, supra, was required to continue the defense of the suit heretofore described, including the trial of said action; and (24) that Harry Linch had coverage under the policy of Continental on the date of the accident, and Continental's refusal and neglect to meet and assume its obligation thereunder breached its contract to the damage in the amount of $11,946.57 of Fireman's Fund, which is subrogated to the rights of Harry Linch.
 
 
 63
 In further and final direct pleading in its answer to the remaining averments of the complaint of Fireman's Fund against it, Continental (answering paragraph 16 of the complaint) admitted that Harry Linch, through Fireman's Fund acquired some knowledge of the policy of insurance issued by Continental to Petco, denied that such coverage as was provided by that policy was primary in connection with the suit against Harry Linch, mentioned in the complaint, and admitted the receipt of the letter of Kenneth C. Groves to the Claims Manager of Continental, bearing date May 3, 1965; (answering paragraph 21 of the complaint of Fireman's Fund), Continental admitted — though it ought probably to be said that it alleged — that by reason of the voluntary actions of the attorney representing Harry Linch and Fireman's Fund in the state court action, supra, a judgment was entered against Harry Linch in the amount of $5,000.00, which was satisfied, but as to the remaining allegations of Fireman's Fund in Civil Action No. 66-C-90 touching that judgment, to the effect that, by the terms of Fireman's Fund's policy in favor of Harry Linch, Fireman's Fund is subrogated to his rights against Continental, for want of information adequate to support an opinion with respect thereto, Continental denied such allegation or allegations.
 
 
 64
 Further answering paragraph 22 of such complaint, Continental admitted that its agents and attorneys were advised of the progress of the trial of the Glunz suit in the state court, but denied that they were given an opportunity to object to any action taken by Harry Linch, through Fireman's Fund; and admitted that Continental, through its agents and attorneys, took no action relative to the judgment therein, and that a period of time equivalent to the expiration of the statutory stay of execution was given to Continental to pay that judgment directly to Glunz, and admitted that it did not satisfy the judgment.
 
 
 65
 And, for asserted want of information adequate to form a belief as to the truth of the allegations in paragraph 23 of the complaint of Fireman's Fund touching the items and amounts of its several alleged elements of special damages, and the aggregate sum thereof, Continental, in its answer, denied such allegation or allegations in its or their entirety.
 
 
 66
 Finally, by way of affirmative defenses to Fireman's Fund's complaint against Continental, Continental alleged the following positions:
 
 
 67
 1. That Fireman's Fund's complaint failed to state a claim against Continental on which relief can be granted;
 
 
 68
 2. That Fireman's Fund voluntarily made payment of a judgment which it voluntarily agreed to allow to be entered against Harry Linch, and has the status of a volunteer paying another's debt, and was and is, therefore, estopped from asserting any claim therefor against Continental;
 
 
 69
 3. That Fireman's Fund was and is, by its own laches, estopped from asserting any claim against Continental;
 
 
 70
 4. That Fireman's Fund's insurance policy is primary to any insurance policy of Continental, and Continental owed no duty or legal obligation to Fireman's Fund or Harry Linch to assume the defense of Harry Linch, or to pay any cost incurred by him, or on his behalf, or any judgment incurred by him;
 
 
 71
 5. That Fireman's Fund failed to mitigate its damages by the negotiation of a settlement of the claim of Glunz against Harry Linch, when reasonable opportunities to do so were available;
 
 
 72
 6. That any injury or damages incurred by Fireman's Fund in consequence of its contractual obligation to Harry Linch arose, not out of the loading or unloading of the vehicle insured by Continental referred to in Fireman's Fund's complaint, but rather as a result of causes other than the unloading of said truck, and, in fact, were incurred as a result of the negligent operation, maintenance, and use of the building exclusively operated and controlled by Harry Linch, and/or his negligence concurring with the negligence of a person, or of persons, other than Continental, which negligence did not arise as a result of the loading or unloading of the truck insured by Continental;
 
 
 73
 7. That Continental owed no duty to Harry Linch or to Fireman's Fund under the policy of insurance referred to in Fireman's Fund's complaint in that the proximate cause of the injuries and damages sustained by Chris Eugene Glunz referred to in Fireman's Fund's complaint, was due to the defective construction, design, maintenance, and use of the building operated and controlled by Harry Linch;
 
 
 74
 8. That in Civil Action No. 20151 in the District Court of Jefferson County, Colorado, wherein Chris Eugene Glunz was the plaintiff and Petroleum Transport Company, i. e. Petco, was a defendant, and Harry Linch was a defendant and third-party plaintiff (vide supra) a judicial determination was made that Petco was not negligent and was not legally responsible to respond in damages to Chris Eugene Glunz, and that said injuries and damages did not arise as a result of the unloading of the truck insured by Continental under the policy of insurance referred to in Fireman's Fund's complaint, and said judicial determination constitutes res judicata as to the claim of Fireman's Fund against Continental that the damages set forth in its complaint by Fireman's Fund were incurred as a result of the unloading of said truck, and operated and operates as a bar to Fireman's Fund's right of recovery therefor;
 
 
 75
 9. That Harry Linch was not using the truck, insured by Continental at the time of the alleged accident of Chris Eugene Glunz, and that the said Harry Linch was not entitled to any coverage as an additional insured under Continental's policy of insurance, and that, as Fireman's Fund's right to recovery as alleged in its complaint is derived from whatever right Harry Linch had under Continental's policy of insurance, the fact that Continental was under no obligation or duty to Harry Linch bars Fireman's Fund's right to recovery in its suit against Continental;
 
 
 76
 10. That, if Harry Linch were entitled to any coverage under the policy of Continental, as against Continental, which Continental does not admit, Harry Linch breached the terms and conditions of Continental's policy by failing to give notice of the accident as required in said policy, breached the cooperation clause of such policy, which breaches of the terms and conditions of said policy bar any right to recovery he may have had thereunder, and said breaches extend to, and are imputed to, Fireman's Fund herein, and bar its right of recovery.
 
 
 77
 Finally, in closing its answer, Continental prayed that the trial court, i. e., the United States District Court for the District of Colorado, enter judgment for Continental and against Fireman's Fund upon such complaint, and enter judgment for continental and against Fireman's Fund for costs, and for such other and further relief as, to such court, may seem proper in the premises.
 
 
 78
 The foregoing reflection, at unwelcome length, is offered, first, in identification of the misadventure out of which, in the first instance, this litigation arose; of the parties participant in it, inclusive of Harry Linch, Petroleum Transport Company (aliter Petco), Chris Eugene Glunz and sundry corporations at least tangentially related to that occurrence, of whose number several do not continue to be parties hereto; and the insurance carriers which, actually or allegedly, were under engagements providing — or asserted to provide — protective coverage claimed to be involved as a consequence of such misadventure; Secondly, in the disclosure of the litigation arising out of that misadventure, which was conducted as Civil Action No. 20151, in the District Court of Jefferson County, Colorado, and the conduct and eventual result thereof; and, Thirdly, in the exhibition of the pleadings, including the complaint of Fireman's Fund and the answer of Continental in the ultimate civil action, from the trial court's judgment wherein the present appeal and cross appeal were taken. Recognizing the explanatory mission, in relation to Case No. 66-C-90 in the United States District Court for the District of Colorado, of those basic events and the earlier state court litigation, this opinion has taken preliminary but extended notice of them. They provide a measure of background against which the complaint and answer in Case No. 66-C-90, and the course in the trial court of that action, may the better be understood.
 
 
 79
 However, Case No. 66-C-90, in which those later pleadings were served and filed, was not "tried" in the United States District Court for the District of Colorado in the usual sense of the "trial" of litigation in that court, see immediately infra.
 
 
 80
 The answer in that case appears to have been filed in the United States District Court for the District of Colorado on February 28, 1966. The case may be, at least, tentatively, considered to have been at issue from that date forward. On December 20, 1966, following the conduct on June 7, 1966 before the Honorable Alfred A. Arraj, Chief Judge of the United States District Court for the District of Colorado of a pretrial conference in the action, there was formally entered and filed in that case a PRE-TRIAL ORDER over the signature of Judge Arraj, and bearing the express approval "as to form and content" signed by Kenneth C. Groves, attorney for Fireman's Fund, and of Yegge, Hall, Treece & Evans, by Wesley H. Doan, attorneys for Continental. A verbatim copy of that pre-trial order follows:
 
 
 81
 "IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
 
 
 82
 FIREMAN'S FUND INSURANCE |
 COMPANY, a California corporation, |
 Plaintiff | No. 66-C-90
 vs > Civil
 CONTINENTAL CASUALTY COMPANY, | PRE-TRIAL ORDER
 an Illinois corporation, |
 Defendant |
 
 
 83
 This matter coming on for Pre-Trial Conference on the 7th day of June, 1966, before the Honorable Alfred A. Arraj, District Judge, the plaintiff appearing by Kenneth C. Groves and the Defendant by the firm of Yegge, Hall, Treece & Evans.
 
 
 84
 1. JURISDICTION.
 
 
 85
 Jurisdiction of this Court is admitted.
 
 
 86
 2. AMENDMENTS TO PLEADINGS.
 
 
 87
 There were no amendments to the pleadings.
 
 
 88
 3. PRELIMINARY MOTIONS REMAINING TO BE DETERMINED.
 
 
 89
 None.
 
 
 90
 4. GENERAL NATURE OF THE CLAIMS OF THE PARTIES.
 
 
 91
 The parties hereto have agreed and stipulated to all of the evidence and facts necessary for a determination of the issues herein involved, such stipulated Statement of Facts being attached hereto and thereby incorporated herein.
 
 
 92
 5. UNCONTROVERTED FACTS.
 
 
 93
 All of the facts hereto are uncontroverted, and stipulated as provided in the attached Statement of Facts.
 
 
 94
 6. ISSUES OF LAW.
 
 
 95
 A. Is the plaintiff herein, being subrogated to the rights of Harry Linch, entitled to recovery from the defendant under the defendant's automobile liability policy on the basis of `use' and omnibus coverage provided thereby.
 
 
 96
 B. If the plaintiff is so entitled to recover, what is the extent and limitations, if any, upon the coverage provided by the defendant's policy.
 
 
 97
 7. WITNESSES.
 
 
 98
 There will be no witnesses called by either party hereto, all of the material issues of fact having been resolved by stipulation and agreement.
 
 
 99
 8. EXHIBITS.
 
 
 100
 The exhibits have heretofore been agreed upon and stipulated to, and made a part of the Agreed Statement of Facts herein described.
 
 
 101
 THE COURT HEREBY ORDERS, in view of the fact that the issues of fact have heretofore been resolved by way of Stipulation and Agreement between the parties, that there is no material or genuine issue of fact remaining to be litigated, and that, therefore, this case is one to be determined by way of Motion for Summary Judgment pursuant to Rule 56 of the Rules of Civil Procedure for the United States District Court.
 
 
 102
 IT IS FURTHER ORDERED that such case shall be disposed of as though each party had filed its Motion for Summary Judgment, and the Court shall make final disposition of said case by merely appending to the Agreed Statement of Facts, its conclusions of law just as though said case had been tried in full and judgment entered on the merits.
 
 
 103
 The issues of law shall be resolved by the Court, after having received from the parties hereto their written briefs, and upon oral argument if the Court deems advisable and necessary such argument.
 
 
 104
 A. Plaintiff shall have thirty days from the entry of this Order within which to file its initial brief.
 
 
 105
 B. Defendant shall have thirty days after the filing of plaintiff's brief within which to respond to it.
 
 
 106
 C. Plaintiff shall have twenty days after the filing of the defendant's brief within which to file a reply brief.
 
 
 107
 Dated this 20th day of December, 1966.
 
 
 108
 BY THE COURT:

 /s/ Alfred A. Arraj
 Judge
 APPROVED AS TO FORM AND CONTENT:

 /s/ Kenneth C. Groves 

 Kenneth C. Groves
 Attorney for Plaintiff

YEGGE, HALL, TREECE & EVANS

By /s/ Wesley H. Doan 
 Attorneys for Defendant "
 
 
 109
 It will be observed, from paragraph 4 of the foregoing pre-trial order, that the AGREED STATEMENT OF FACTS, mentioned therein is attached to, and incorporated in, such original pre-trial order. It is so attached. A copy of the typewritten and signed AGREED STATEMENT OF FACTS, not, however, including the exhibits to the stipulation attached thereto and referred to therein, (vide infra) follows:
 
 
 110
 "IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
 
 
 111
 FIREMAN'S FUND INSURANCE |
 COMPANY, a California corporation, | No. 66-C-90
 Plaintiff |
 vs. > Civil
 CONTINENTAL CASUALTY COMPANY, |
 an Illinois corporation, | AGREED STATEMENT
 Defendant | OF FACTS
 
 
 112
 This is an indemnity and breach of contract action between the plaintiff, Fireman's Fund Insurance Company, hereinafter referred to as the `Fund', and the defendant Continental Casualty Company, hereinafter referred to as `Continental', to recover the amount of a judgment rendered in favor of Chris Eugene Glunz, hereinafter referred to as `Glunz', against the insured of this plaintiff, Harry Linch, referred to herein as `Linch', together with costs and attorney's fees incurred in connection therewith.
 
 
 113
 Prior to October 7, 1963, Continental had issued a certain policy of automobile insurance to a Colorado corporation known as Petroleum Transport Company, hereinafter referred to as `Petco', which policy was in full force and effect on October 7, 1963. The plaintiff issued its policy of garage liability insurance to Linch, which policy was, on said date, in full force and effect. Copies of each of the respective policies are attached hereto.
 
 
 114
 On or about October 7, 1963, Linch, who leased and operated under his sole and exclusive control, a Standard Service Station located at 7201 Grandview Ave., Arvada, Colorado, placed an order with Petco for 6000 gallons of liquid gasoline for transportation and delivery to his service station on October 7, 1963. Petco was engaged in the general business of transporting and delivering petroleum products, and had been engaged in that business for several years. Petco had made similar deliveries to the station operated by Linch on several prior occasions without incident, but never in the quantity which was delivered on October 7, 1963.
 
 
 115
 All deliveries of liquid gasoline to Linch's station were made by unloading the same into underground storage tanks located on the premises immediately South of the station building. These storage tanks supplied the station's gas pumps. The underground tanks were equipped with a venting system running from the tanks underground, to the outside of the service station building, then up the side of the building to the roof line. A blueprint of the venting system and the manner in which it was attached to the underground tanks is attached hereto. The venting system was an integral part of the storage tanks and was a necessary instrument for the unloading of liquid gasoline into the underground storage tanks, and for the storage thereof, since it served to disperse and dissipate fumes which could, and did, develop from unloading operations.
 
 
 116
 On October 7, 1963, Glunz, an employee of the McBride Lighting Company, was present at Linch's station for the purpose of cleaning certain lighting fixtures thereon located. While performing such duties, Glunz found it necessary to use the restroom facilities located on said premises in the interior part of the service station building. At the same time, Petco's truck arrived at the station with 6000 gallons of regular and premium gasoline for unloading into Linch's storage tanks. After securing Linch's approval of the gallonage, and his permission to unload, Petco, through its agent and employee, commenced to unload the 6000 gallons of gasoline from its truck into the underground storage tanks. The unloading of gasoline was accomplished by means of attaching two or more hoses to the Petco truck, which were dropped and placed into the underground storage tanks and secured thereto by connections on the hoses screwed to the storage tank caps. These connections were airtight and no escape of fumes was possible at the place of the connections. Glunz, in the meantime, had entered the restroom, also located on the south side of the station building, a short distance from the storage tanks.
 
 
 117
 After Glunz had gone into the restroom and seated himself upon the toilet stool, and while Petco was still unloading the liquid gasoline, he lit a match for the purpose of lighting a cigarette and an explosion occurred whereby he sustained injuries.
 
 
 118
 The 6000 gallons of liquid gasoline were unloaded from the Petco truck into Linch's underground tanks by gravity flow at the rate of approximately 110 gallons per minute. The rapidity with which the unloading procedure was accomplished caused turbulence in the underground tanks, which in turn created gasoline fumes or vapors which were discharged from the underground tanks through the venting system above described. A substantial portion of these fumes, which arose from the unloading operation, passed through the venting system and accumulated in the restroom where Glunz was then situated. It is admitted by the parties hereto that the explosion was caused by the gasoline fumes which arose from this unloading operation.
 
 
 119
 About the month of May, 1965, Glunz filed an action in the District Court in and for the County of Jefferson, State of Colorado, against Linch and Petco, among others, to recover damages in the amount of $100,000 for the personal injuries incurred by him as a result of the explosion. A copy of said complaint is attached hereto. Linch then joined Victor Ries, the contractor who built the station building, as a third party defendant. Service was obtained upon Linch and Petco, and the complaint and summons were referred to the respective parties' liability insurance carriers, who thereafter caused answers and other incidental pleadings to be filed on behalf of their insureds. It was the contention of Glunz that Linch was guilty of actionable negligence by reason of an accumulation of gasoline and gasoline vapors in the space between the ceiling of the restroom and the roof of the service station which was under the management and control of Linch. It was further alleged, as to the negligence of Linch, that the building had been improperly constructed and was improperly repaired and maintained which permitted the accumulation of gasoline vapors in the aforementioned area. The plaintiff also complained that Linch was negligent in permitting Petroleum Transport Company to unload and empty into the storage tanks the large volume of gasoline, thereby permitting a dangerous volume of gasoline vapors to accumulate and increase the volume of the inherently dangerous and explosive gas, all of which matters are fully set forth in the plaintiff Glunz's complaint in Paragraph 16, subparagraph (o).
 
 
 120
 Trial was held in the District Court of Jefferson County, Colorado, during which testimony was taken and the defendants, Standard Oil Company of Indiana and Petroleum Transport Company, received a directed verdict of dismissal of the claims of Glunz against them. In the course of the testimony, it was developed that the building in question was constructed by Victor C. Ries under a contractual agreement with Cook Bros. Oil Co., pursuant to plans provided by the Standard Oil Company and the American Oil Company. The construction plans called for the termination of the venting system to be above the roof line. However, in constructing the station, Ries terminated the vent pipes beneath the gutter, surrounding the top of the building, thereby placing the ends of the vent pipes at a level beneath the roof line of the building. This Linch does not dispute for the purpose of this suit. Ries testified that the building, during the course of construction, had been inspected on twelve separate occasions by the Building Inspection Department of the City of Arvada, and that a certificate of occupancy had been issued after the completion of construction.
 
 
 121
 The Fund undertook the defense of Linch pursuant to the terms and provisions of its policy herein described, and denied knowledge or responsibility for the alleged defective condition of the premises.
 
 
 122
 Thereafter, plaintiff discovered that the defendant, Continental, had issued its automobile public liability and property damage insurance policy, above-described, a copy of which is attached hereto. The plaintiff herein, elected on behalf of Linch to seek coverage under the terms and provisions of Continental's policy upon the basis that Linch was an additional insured thereunder and therefore was entitled to coverage and insisted that the coverage therein provided was primary to the insurance available under its general liability insurance contract.
 
 
 123
 A demand was made upon the defendant Continental to assume the defense of Linch, and to pay any judgment rendered against him, including costs, attorney's fees and all other expenses incurred in connection therewith, pursuant to the following quoted provision of the Continental public liability and property damage insurance contract:
 
 INSURING AGREEMENTS
 1 Coverage A — Bodily Injury Liability
 
 124
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.
 
 Coverage B — Property Damage Liability
 
 125
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of any automobile.
 
 
 126
 * * * * * * *
 
 111 Definition of Insured
 
 127
 The unqualified word "insured" includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured. * * *
 
 CONDITIONS
 
 128
 * * * * * * *
 
 4. Purposes of Use Defined
 
 129
 * * * * * * *
 
 
 130
 (c) Use of an automobile includes the loading and unloading thereof.
 
 
 131
 The Fund's demand was rejected, and Continental was thereafter again notified that Linch elected to avail himself of the coverage afforded under its automobile public liability and property damage policy issued to Petco, and it was, upon that occasion, informed that if Linch's defense was not assumed, that the necessary action to enforce performances of the terms of its policy would be instituted. This second notification and demand to assume Linch's defense was refused on May 17, 1965. True copies of said notifications and demands are attached hereto.
 
 
 132
 Plaintiff herein continued the defense of Linch in the Glunz action, and after the trial thereof had proceeded to a point where all of the testimony had been taken, Linch voluntarily permitted a judgment to be entered against him in the sum of $5,000. The judgment entered against him was by virtue of his stipulation and agreement.
 
 
 133
 Prior to the entry of said judgment, Continental, through its agents and attorneys of record, were advised of the progress of the trial after they had obtained a dismissal of their client, Petroleum Transport Corporation, and were told of the action which was contemplated with respect to the entry of judgment against Linch and were given an opportunity to object thereto, or to otherwise participate therein. The offer made to Continental through its agents and attorneys of record, was that they should either pay the judgment which was to be taken against Linch, or go back into Court and take over his defense, which, at that point, consisted of nothing more than preparation of jury instructions and making oral arguments to the jury and then paying the judgment which might be rendered against Linch by verdict of the jury. This offer was denied by Continental through its agents and attorneys of record, and they refused to either satisfy, or otherwise dispose of the judgment or to assume any responsibility for the defense of Linch in the action brought against him by Glunz. As a result of the defense of Linch, the Fund incurred expenses, over and above the judgment of $5,000, for costs and attorney's fees, in the total sum of $6,946.57.
 
 
 134
 The Fund is subrogated to the rights of Linch under the terms and provisions of its general liability insurance contract in which Linch is the named insured.
 
 
 135
 /s/ Kenneth C. Groves
 Attorney for Plaintiff
 475 Capitol Life Center
 Denver, Colorado 244-5414

 /s/ Wesley H. Doan
 Wesley H. Doan of Yegge,
 Hall, Treece and Evans
 Attorneys for Defendant
 1340 Denver Club Building
 Denver, Colorado 222-2855"
 
 
 136
 In the service of brevity, it is here made clear that, in accordance with assurance to that end in the agreed statement of facts just mentioned and copied in full, copies of the following items are physically attached to such STATEMENT OF FACTS:
 
 
 137
 (a) Continental's policy of insurance in favor of The Permian Corporation and sundry identified "affiliates and subsidiaries," including Petroleum Transport Company, also known herein, and elsewhere, as "Petco;"
 
 
 138
 (b) The policy of insurance issued by Fireman's Fund in favor of Harry Linch;
 
 
 139
 (c) A blueprint (although, perhaps, more exactly, a photographic, or other, copy of a blueprint) in multiple pages of the venting system of the involved Standard Service Station building; (d) Copies of the Complaint of Chris Eugene Glunz in Case No. 20151 in the District Court of Jefferson County, Colorado, and of the answers thereto of Harry Linch, ad of Petroleum Transport Company, i. e. Petco.
 
 
 140
 Of those several exhibits it is now said only that they serve to support the several statements concerning them respectively, which are made in the admitted allegations in the pleadings in this litigation, and also the factual declarations of the AGREED STATEMENT OF FACTS, supra.
 
 
 141
 By way also of possibly instructive amplification, it is to be understood that paragraph 16, subparagraph (o) of the Glunz complaint, in the state court case, alluded to in Civil Action No. 66-C-90, in the United States District Court for the District of Colorado is in this language:
 
 
 142
 "16. That the negligence, carelessness and recklessness of the defendants, in the cause of action named, consisted of the following:
 
 
 143
 * * * * * * * * * *
 
 
 144
 `(o) In allowing and permitting the defendant, Petroleum Transport Co., to unload and empty into the storage tank of the Standard Service Station large quantities of gasoline at a time and under circumstances when a large and dangerous volume of gas and gas vapors had accumulated in and about the premises and thus increase the volume of the inherently dangerous and explosive gas and, by reason of the premises, increase the danger and volume of the explosion.'"
 
 
 145
 On April 3, 1967, and after the tender and submission in behalf of each of the parties to Civil Action No. 66-C-90 in the United States District Court for the District of Colorado, that court by and through the Honorable Alfred A. Arraj, then still, and now, Chief Judge of said court, made, entered and caused to be filed in such action, its MEMORANDUM OPINION AND ORDER determinative of the issues therein. That filing reflects such thorough consideration that a complete copy of it is set out, as follows:
 
 
 146
 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
 
 Civil Action 66-C-90
 
 147
 FIREMAN'S FUND INSURANCE COMPANY,
a California corporation,
 Plaintiff,
v.
CONTINENTAL CASUALTY COMPANY,
an Illinois corporation,
 Defendant.
 
 
 148
 Mr. Kenneth C. Groves, Attorney at Law, 475 Capitol Life Center, Denver, Colorado, for Plaintiff; Yegge, Hall, Treece and Evans, by Mr. Wesley H. Doan, Attorney at Law, 1340 Denver Club Building, Denver, Colorado, for Defendant.
 
 
 
 Notes:
 
 
 *
 Sitting by designation from the Eighth Circuit
 MEMORANDUM OPINION AND ORDER
 ARRAJ, Chief Judge
 Both parties to this action have moved for summary judgment, agreeing that there are no genuine issues as to material facts. Plaintiff insurance company claims that its right to bring the present action is derived from a subrogation agreement with its insured, Mr. Harry Linch.
 The following salient facts are set out in order to put the present motions in their proper perspective. In 1963 plaintiff company had in effect a garage liability policy insuring Harry Linch, who operated a garage and service station. Defendant company had in effect an automobile liability policy insuring Petroleum Transport Company, a Colorado corporation which will be referred to as "Petco".
 On October 7, 1963 Linch ordered 6000 gallons of liquid gasoline from Petco, which was in the business of transporting and delivering petroleum products. The deliveries of gasoline to Linch's station were accomplished by unloading the gasoline into underground storage tanks on the premises. The tanks were equipped with a venting system which ran from the tanks to the outside of the service station building then up the side of the building to the roofline.
 Also on that date a Mr. Glunz was at the service station to clean some lighting fixtures. During the course of his work Glunz found it necessary to utilize the restroom facilities at the station. At about the same time, the Petco supply truck arrived and commenced unloading gasoline by extending hoses from the truck into the storage tanks. While the gas was still being unloaded, Mr. Glunz lit a match and an explosion occurred, seriously injuring him. It is admitted that the explosion was caused by the gasoline fumes which arose from the unloading operation.
 As a result of this incident, Glunz commenced suit in the Colorado state court against Linch, Petco and others. He alleged that Linch was negligent in allowing gasoline vapors to accumulate in the space between the ceiling of the restroom and the roof of the service station. He further alleged that the building was improperly constructed and maintained, and that Linch was negligent in permitting Petco to unload such a large volume of gasoline.
 At the trial Petco was dismissed by a directed verdict in its favor. The defense of Linch was undertaken by plaintiff insurance company pursuant to the terms of its policy. Plaintiff discovered that defendant company had issued its liability policy to Petco, and plaintiff elected on behalf of Linch to seek coverage for Linch under the provisions of defendant's policy, on the theory that Linch was an additional insured. Plaintiff made demands on defendant to assume the defense of Linch, asserting that plaintiff was only an excess carrier whose coverage was secondary to that of defendant. In spite of the demands, defendant denied coverage and refused to defend.
 The testimony in the case revealed that the venting system had been improperly constructed. After all of the testimony was in, Linch voluntarily permitted a judgment to be entered against him for $5,000. Prior to the entry of judgment, however, defendant was again notified and given the opportunity to participate or to object to the stipulated judgment. Defendant again refused. In the instant action plaintiff asserts that defendant is obligated for the $5,000 judgment which plaintiff paid and also for $6,946.57 in costs and attorneys' fees were incurred.
 Plaintiff's theory is that its insured, Linch, was also an insured within the omnibus clause of defendant's policy to Petco, and that having paid the judgment plaintiff "somehow, someway, sometimes steps into (Linch's) shoes." Great American Ins. Co. v. General Acc. Fire & Life Assur. Corp., 321 F.2d 948, 950 (5th Cir. 1963).
 The respective claims of the parties are numerous and intricate, and we will deal with them separately. The threshold question is whether defendant's policy even covered the accident which formed the basis of Glunz's suit.
 Defendant's liability policy provides coverage to the insured for sums for which he becomes legally obligated to pay as damages because of injuries `sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.' The word `insured' in the policy includes `the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * * *'. The policy also provides that: `Use of an automobile includes the loading and unloading thereof.'
 Can the accident be said to have arisen out of the `use,' including the loading or unloading, of the Petco truck? The Colorado courts have never had occasion to construe the `loading-unloading' clause now prevalent in automobile liability policies. Numerous courts in other states have interpreted the provision, however, and it is universally recognized as having the effect of expanding the definition of vehicular use beyond its ordinary meaning.
 Two schools of thought have developed with respect to the interpretation of the loading and unloading clause. Some courts have construed the clause narrowly, by application of what has been labeled the `coming to rest' doctrine.
 According to this doctrine unloading within the meaning of the `unloading' clause comprises only the actual removing or lifting of the article from the motor vehicle up to the moment where (a) the goods which were taken off the automobile have actually come to rest and (b) every connection of the motor vehicle with the process of unloading has ceased. Annot., 160 A.L.R. 1259, 1264 (1946).
 See also, e. g., Stammer v. Kitzmiller, 226 Wis. 348, 276 N.W. 629 (1937); Jackson Floor Covering, Inc., v. Maryland Casualty Co., 117 N.J.L. 401, 189 A. 84 (1937); Annot., 95 A.L.R.2d 1122, 1129 (1964).
 
 
 A
 broader interpretation of the clause is evinced by the `complete operation' doctrine. Under this theory, which is unquestionably now the majority rule, see 95 A.L.R.2d supra
 `Unloading' is regarded as embracing all the operations which are required in any specific situation to effect a completed delivery of the article. American Auto. Ins. Co. v. American Fidelity & Cas. Co., 106 Cal.App.2d 630, 235 P.2d 645 (1951).
 See also, Wagman v. American Fidelity & Cas. Co., 304 N.Y. 490, 109 N.E.2d 592 (1952). It might well be concluded that the facts of the present case could fall within either of the two tests, for the unloading was admittedly still being carried on at the time of the accident. The doctrinal dichotomy is significant, however, because of the different degree of causal relation which is required under the respective tests before the `unloading-loading' clause will be applicable and liability imposed on the carrier. Those jurisdictions which construe the clause narrowly require that the loading or unloading be the efficient, predominating or even proximate cause of the accident before coverage will be recognized. However, those jurisdictions which espouse the broader theory often require only `the most minimal "but for" relationship.' Johnson, Drake & Piper, Inc., v. Liberty Mut. Ins. Co., 258 F. Supp. 603, 607 (D.Minn.1966).
 Since the evidence at the Glunz trial disclosed that the construction of Linch's service station was defective, and since Petco received a directed verdict of dismissal in that action, it is rather unlikely that the unloading of the Petco truck could be considered the proximate cause of the accident. Hence, if the narrow construction of the unloading clause were adopted by this Court, we would have to conclude that the accident did not arise from the `ownership, maintenance or use' of the Petco truck, and defendant would necessarily succeed on his motion.
 It is the opinion of the Court, however, that the broader view embodies not only the majority but also the better-reasoned view.
 The question is not one in the field of torts of proximate cause of the accident, but one in the field of contracts of coverage under the wording of an insurance contract. While there must be a causal relationship between the insured use, that is unloading, and the accident, the question is not whether the insured truck was the cause of the accident. St. Paul Mercury Ins. Co. v. Huitt, 336 F.2d 37, 43 (6th Cir. 1964).
 See also, Johnson, Drake & Piper, Inc., v. Liberty Mut. Ins. Co., supra; Federal Ins. Co. v. Michigan Mut. Liability Co., 277 F.2d 442 (3d Cir. 1960).
 Colorado has no decisions directly in point on the question but defendant urges that in a recent ruling, Mason v. Celina Mut. Ins. Co., 423 P.2d 24 (Colo.1967), the Colorado Supreme Court recognized a requirement that the use of the automobile be the proximate cause of the accident before the liability policy will be applicable. In Mason the facts were that three children were sitting in a parked automobile. One of the boys was toying with a loaded gun, which discharged killing another boy. In holding that the automobile policy did not cover the accident, the Colorado Supreme Court stated that: `Here no causal connection between the discharge of the pistol and the stopped vehicle was shown * * *.' (Emphasis added.) In other words, the only relation the automobile bore to the accident was that it was the site of the occurrence. Even under the broadest interpretation of the unloading-loading clause, it is recognized that there must be some causal relationship; for this reason the Mason case does not commit Colorado to either of the two doctrines of interpretation.
 We determine that the unloading-loading clause should be given the broader interpretation, and since the accident involved in the present case would not have occurred `but for' the unloading of gasoline from the Petco truck, the accident arose out of the use of the truck within the meaning of the policy. The causal link is at least that strong. The parties admit that `the explosion was caused by the gas fumes which arose from the unloading operation.'
 Concluding then than the accident arose out of the use of the truck, we are next confronted with the issue of whether Linch was either `using' the truck, or `legally responsible' for its use, so as to qualify as an additional insured. It has been held in some cases that where the proprietor of a business furnishes equipment on his premises which is necessary to and an integral part of the unloading operation he is factually `using' the vehicle within the meaning of the policy. Chenango Gas Co., Inc., v. Allstate Ins. Co., 39 Misc.2d 177, 240 N.Y.S.2d 194 (1963), aff'd, 19 A.D.2d 928, 245 N.Y.S.2d 330; Employers' Liability Assur. Corp. v. Indemnity Ins. Co., 228 F.Supp. 896 (D.Md.1964).
 In the instant case, as plaintiff has pointed out, `the venting system was an integral part of the storage tanks, and was a necessary instrument for the unloading of liquid gasoline into the underground storage tanks.' Linch can thus be said to have been `using' the truck within the rationale of the cited decisions.
 Plaintiff also argues that even if Linch were not `using' the truck in the strict sense of the word, he was nevertheless `legally responsible' for its use, which status also brings him within the definition of an additional insured under defendant's policy. In support of its assertion that the proprietor of a business is legally responsible for accidents occurring during the unloading of a third party's supply truck on his premises, plaintiff cites Tri-State Concrete, Inc. v. Nationwide Mut. Ins. Co., 5 A.D.2d 384, 172 N.Y.S.2d 123 (1958); and Continental Casualty Co. v. Duffy, 26 A.D.2d 630, 272 N.Y.S.2d 470 (1966). There is no doubt that Linch was in absolute control of and responsible for the service station premises. He owed the duty to the public to see that the premises were free from dangerous conditions, and he thus had the duty to supervise the unloading of the gasoline truck on his premises. `We equate supervision to use and obligation of supervision to legal responsibility for the use.' Tri-State Concrete, Inc. v. Nationwide Mut. Ins. Co., supra, 5 A.D.2d at 386, 172 N.Y.S.2d at 126. We therefore agree with plaintiff's argument that Linch was an additional insured within the purview of the omnibus clause of defendant's automobile liability policy.
 Defendant maintains that even if Linch is found to be an insured within the terms of its policy, he is still entitled to no coverage because of the policy's `service station exclusion.' The pertinent exclusionary clause reads as follows:
 The insurance with respect to any person or organization other than the named insured does not apply: * * *
 (b) To any person or organization, or to any employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any accident arising out of the operation thereof.
 It is admitted by plaintiff that Linch was engaged in the garage or service station business, and it is also quite clear that such an exclusionary clause is valid and effective under Colorado law, Phoenix Assur. Co. of New York v. Ocean Acc. & Guarantee Corp., 145 Colo. 26, 357 P. 2d 642 (1961).
 In order to determine whether the exclusion is to be given effect to the facts in the case at bar, it is necessary to examine the purpose of and rationale behind its inclusion in liability policies.
 The reason for refusing to extend insurance coverage to such persons and organizations is obvious. When the named insured places his automobile in the custody of any person or organization operating an automobile sales agency, repair shop, service station, storage garage or public parking place, the insured has no knowledge as to who will be entrusted with the operation of his automobile while it is in the control of such person or organization. Dixie Automobile Insur. Corp. v. Mason, 155 So.2d 172 (Fla.App.1963).
 Similarly, as the court pointed out in Buxton v. Randel, 159 Kan. 245, 154 P.2d 129, 131 (1944): `There are so many more occasions when some irresponsible person would be apt to be driving the car in question in the operation of one of them.'
 This rationale does not extend to the type of fact situation presented in the present case, where the actual operation of the truck was by an employee of the named insured, Petco, rather than by a third person whose skill, experience and driving habits were unknown to the insured.
 The unloading process involved here was part of the operation of Petco, the gasoline supplier, rather than the operation of the service station. `Here, the gasoline supplies were being delivered to the service station by the supplier in the supplier's own tank truck, a customary, necessary and incidental operation of the supplier's business.' (Emphasis added). Insurance Co. of State of Pennsylvania v. Palmieri, 81 N.J.Super. 170, 195 A.2d 205, 209 (N.J.1963).
 It should also be noted that if defendant's broad interpretation of the exclusionary clause were adopted, this would in effect nullify the `unloading-loading' clause of the policy. It is obvious that when a gasoline supply truck loads and unloads its commodity, it almost invariably does so at the location of, and pursuant to its business relationship with, service stations. Thus, if every unloading at a service station is excluded from coverage, there is little if any unloading coverage afforded to a gasoline supply truck. It is a well-established principle of construction that one clause of a policy should not be interpreted so as to render another one nugatory.
 For these reasons it is the Court's conclusion that the exclusionary clause was not designed to avoid liability in a case such as the present one, and it will therefore not be given that effect.
 Defendant also contests plaintiff's position that it is only an excess carrier, while defendant is the primary insurer. Defendant points to the fact that plaintiff also provided some automobile coverage to its insured Linch, by an endorsement to its general policy, and defendant argues that the `other insurance' provision of the endorsement did not limit the coverage to excess liability in a case such as this one. Therefore, defendant claims that it could only be liable for its pro rata share rather than for the total amount.
 The applicable paragraph of the endorsement to plaintiff's policy reads as follows:
 
 
 [3]
 Other Insurance: The insurance afforded by this endorsement shall be excess insurance over any other valid and collectible insurance available to the insured or to the claimant under the Automobile Medical Payments Coverage; but if the other insurance is stated to be applicable only as excess insurance or on a contingent basis, then the company shall not be liable under this endorsement for more than its pro rata share of the loss as determined in accordance with the first paragraph of the Other Insurance Condition of the policy
 Defendant urges that the excess provision is applicable only to insurance available under the `Automobile Medical Payments Coverage.' However, plaintiff contends that the excess provision pertains to all other insurance and submits that the insurance shall be excess as to the insured, or to the claimant as to the Medical Payments Coverage. The word `insured' refers to Part I of plaintiff's policy, the liability section, and the word `claimant' refers to Part II, the medical payments section, but both are brought within the excess clause. Plaintiff's construction is buttressed by the wording of the `other insurance' clause in the principal policy: `If the insured, or with respect to Part II the claimant, has other insurance,' etc. The addition of the commas makes the meaning more obvious, but this would appear to be the correct construction. The coverage provided by the endorsement is only excess coverage which is secondary to that of defendant's policy. There is no claim that defendant's policy provided only excess coverage; it contained a pro rata clause. We therefore conclude that defendant became liable for the entire amount of the judgment entered against Linch, who qualifies as an additional insured under defendant's automobile liability policy.
 Defendant contends that plaintiff's proper remedy would have been to bring a declaratory judgment action, and that by agreeing to and paying the stipulated judgment plaintiff acted as a volunteer, giving it no standing to seek recovery in the instant action. This contention is totally without merit. The remedy of declaratory judgment is certainly not an exclusive one, and plaintiff took sufficient measures by advising defendant that it had the obligation to defend the original suit and by notifying defendant before the proposed judgment stipulation was consummated.
 By voluntarily paying the judgment in the Glunz case, plaintiff was in no sense acting as a volunteer; indeed, public policy prohibits that classification in a case such as the present one. See 8 Appleman, Insurance Law & Practice § 4934 at p. 453 (1962). A `volunteer' is a stranger or intermeddler with no interest to protect. Plaintiff definitely had an interest to protect and is now perfectly entitled to bring the present action. See Massachusetts Bonding & Ins. Co. v. Car and General Ins. Corp., 152 F.Supp. 477 (E.D.Pa.1957); Employers Mut. Liab. Ins. Co. of Wisconsin v. Pacific Indemnity Co., 167 Cal.App.2d 369, 334 P.2d 658 (1959).
 The only remaining issue is whether plaintiff is entitled to recover the attorneys' fees and costs incurred in the defense of Linch in the original action. We determine that it is not. Plaintiff's policy with Linch contained the following covenant:
 The company will pay, in addition to the applicable limits of liability:
 (a) All expenses incurred by the company, all costs taxed against the insured in any suit defended by the company * * *
 The obligation to defend is completely separate from the obligation to pay any judgment ultimately rendered against the insured, and the defense responsibility is not affected by the plaintiff's `other insurance' provision. Although plaintiff's liability `is for excess coverage over and above any other collectible insurance, the obligation to defend is not so limited.' West American Ins. Co. v. Allstate Ins. Co., 295 F.2d 513, 515 (10th Cir. 1961). See also, United States Fidelity & Guaranty Co. v. Tri-State Ins. Co., 285 F.2d 579 (10th Cir. 1960); American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., 280 F.2d 453 (5th Cir. 1960); Financial Indemnity Co. v. Colonial Ins. Co., 132 Cal.App.2d 207, 281 P.2d 883 (1955).
 Plaintiff defended Linch in accordance with its obligation, but there has certainly been no showing that it incurred any greater costs in defending than it would have had defendant assisted in the defense. Great Atlantic & Pacific Tea Co. v. Pepsi-Cola Bottling Co., 209 F. Supp. 629 (E.D.Ill.1962).
 As to this claim by the plaintiff, the case is one `in which one insurer having the good fortune to find some other insurer who has written a policy for someone else attempts to engraft itself upon the contract to which it was not a party in the hopes that what it bound itself to do, it need not perform.' American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., supra, 280 F.2d at 453. We cannot allow plaintiff thus to escape its contractual obligation to defend; it is entitled to no contribution or indemnity.
 It is therefore the conclusion of the Court that defendant is liable for the $5,000 stipulated judgment paid by plaintiff, but that plaintiff is not entitled to the attorneys' fees and costs incurred in the defense of Mr. Linch.
 Plaintiff will submit an appropriate form of judgment, in accordance with this memorandum, within ten days.
 DATED at Denver, Colorado, this 3rd day of April, A.D.1967.
 BY THE COURT

 /s/ Alfred A. Arraj 
 ALFRED A. ARRAJ, Chief Judge
 United States District Court"
 On April 11, 1967, the trial court, Chief Judge Arraj presiding, made and entered judgment in Civil Action No. 66-C-90, in the following language:
 "IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
 Civil Action No. 66-C-90
 FIREMAN'S FUND INSURANCE COMPANY, |
a California corporation, |
 Plaintiff |
 |
vs. > JUDGMENT
CONTINENTAL CASUALTY COMPANY, |
an Illinois corporation, |
 Defendant |
 THIS MATTER coming on to be heard on the respective Motions for Summary Judgment filed by each of the parties hereto and directed to stipulated facts heretofore filed, and the Court having given conclusions of law and a formal written opinion in respect thereto, which, by stipulation of counsel for each of the parties, has been approved as such and incorporated herein by reference, the Court enters the following rulings on said Motions.
 THE COURT ORDERS that plaintiff have judgment against the defendant in the total sum of $5,363.16, such judgment to include costs of this action in the amount of $18.24 together with interest from the date of filing the complaint herein in the amount of $344.92.
 IT IS THE FURTHER JUDGMENT OF THIS COURT that pursuant to the Motion of the plaintiff for attorney fees and costs in the total amount of $6,946.57 the defendant shall have judgment against the plaintiff thereupon and the plaintiff shall take nothing by virtue of its claim therefor.
 DONE in Open Court this 11th day of April, 1967.
 BY THE COURT:

 /s/ Alfred A. Arraj
 Judge
APPROVED:

/s/ Kenneth C. Groves
Attorney for Plaintiff

/s/ Wesley A. Doan
Wesley A. Doan
of YEGGE, HALL, TREECE & EVANS
Attorneys for Defendant"
 On May 10, 1967, Continental filed in Civil Action No. 66-C-90 its notice of appeal to this court "from that part of the final judgment entered in this" (i. e. Civil Action No. 66-C-90) "action on April 11, 1967, which ordered that plaintiff have judgment against the defendant in the total sum of $5,363.16, such judgment to include costs of this action in the amount of $18.24, together with interest from the date of filing the complaint herein in the amount of $344.92."
 Thereafter, and on May 18, 1967, Fireman's Fund filed in the civil action just mentioned its notice of cross appeal to this court "from that part of the final judgment entered in this (i. e. Civil Action No. 66-C-90) "action on April 11, 1967, which ordered that defendant have judgment against plaintiff on plaintiff's claim for attorney's fees and costs in the total amount of $6,946.57."
 Still later, and on May 19, 1967, both appealing parties entered into, and on May 23, 1967, they caused to be filed herein, a stipulation, the body whereof is in this language:
 "The parties hereto, by and through their respective counsel, stipulate and agree that the attorney's fees and costs in the sum of $6,946.57 are reasonable, and were necessarily incurred in the defense of the Jefferson County, Colorado Court Civil Action No. 20151, entitled Chris Eugene Glunz v. Harry Linch, et al."
 Beyond question, — and none appears to be advanced — that stipulation eliminated from possible controversy, both (a) the practical necessity for the incurring of the obligation for miscellaneous expenses, and attorney's fees incident to the defense of Harry Linch in the litigation in the District Court of Jefferson County, Colorado, being case No. 20151 therein, arising out of the explosion, and (b) the reasonableness in the amount of the obligations on that account by Fireman's Fund incurred.
 By their respective appeal (No. 9508), and Cross-Appeal (No. 9509), to this court, (1) Continental, as the prime appellant, challenges as erroneous (a) the trial court's award to Fireman's Fund as against Continental in Civil Action No. 66-C-90, of the sum of $5,363.16, with interest, supra, on any part thereof, (b) the trial court's action in not holding that Fireman's Fund's policy was "primary" to that of Continental, (c) the trial court's action in not holding that Continental's policy was "excess" to that of Fireman's Fund, and (d) the trial court's action in according to Harry Linch any protective coverage by Continental under Continental's policy of insurance in favor of Petco, supra; and, (e) the trial court's action in according to Harry Linch any protective coverage by Continental under Continental's policy of insurance in favor of Petco, supra; and, (II) Fireman's Fund, as the cross-appellant, challenges as erroneous the trial court's denial of the demand of Fireman's Fund for judgment against Continental in the sum of $6,946.57, or any part thereof, on account of attorney's fees and sundry costs and expenses, by Fireman's Fund incurred, incident to the defense of Harry Linch as a defendant in the case of Glunz v. Linch, et al, Civil Action No. 20151, in the District Court of Jefferson County, Colorado.
 In furtherance, and supportive, of its appeal, supra, Continental, in its briefs before this court, advances the argument that the trial court, in its ruling and judgment appealed from in the prime appeal, erred in the following several respects:
 
 
 [1]
 in holding that Harry Linch was an additional insured under the omnibus clause of Continental's policy;
 
 
 [2]
 in holding that the exclusionary provision of Continental's policy pertaining to service stations did not avoid coverage to Harry Linch;
 
 
 [3]
 in not holding that Fireman's Fund's policy was primary to that of Continental;
 
 
 [4]
 in not holding that Continental's policy was excess to that of Fireman's Fund; and,
 
 
 [5]
 in not granting Continental's motion for summary judgment
 Having in view the foregoing extended recollection, first, of the factual foundation, and, secondly, of the respective courses, of the several items of litigation, originally in the Colorado State Court, and more recently in the United States District Court for the District of Colorado, arising out of the controversy between Fireman's Fund and Continental, this court has accorded respectful consideration to the contention just summarized, of Continental, in their successive aspects, and to the briefs and arguments in behalf of the several parties litigant. In sequence conforming to Continental's enumeration of its appellate points, and as briefly as seems to be appropriate, attention is presently accorded to those points. Thus proceeding, this court will take occasion to allude, from time to time, to the opinion of the trial judge and to identify and, in effect, to incorporate herein, portions thereof by references to his language in that opinion, which has already been fully quoted, supra.
 Continental contends, first, that Chief Judge Arraj was in error in holding that Harry Linch was an additional insured under the so-called "omnibus clause" of Continental's policy.
 The paragraphs in the trial judge's typed opinion are actually unnumbered. But the writer hereof has concluded from a count (wherein inset or quoted material is not separately paragraphasized) that in that opinion there are thirty-eight such unnumbered paragraphs. In quest of brevity, the contents of those unnumbered paragraphs will, from time to time hereinafter, be identified principally by arbitrarily attributing herein to those paragraphs, numbers in the sequence of their appearance in the opinion of Chief Judge Arraj, as already quoted herein.
 In the opinion of the trial court supportive of its judgment now under review, Chief Judge Arraj devoted to the disputed issue of Harry Linch's coverage as an additional insured under the omnibus clause of Continental's policy to Petco, the unnumbered paragraphs of such opinion from the second such paragraph, opening with the sentence, "The following salient facts are set out in order to put the present motions in their proper perspective.," through the twentieth such paragraph, whose closing sentence is, "We therefore agree with plaintiff's argument that Linch was an additional insured within the purview of the omnibus clause of defendant's automobile liability policy.," both inclusive. (This court is quite aware that, immediately after the sentence last quoted, the trial judge proceeded, in the next ensuing paragraph of his opinion to his recognition of the related, and, theretofore yet untreated and reserved question whether Harry Linch was barred from coverage under Continental's policy, in consequence of that policy's possession of a familiar "service station exclusionary provision." That subject was, thus, later and individually, considered in such opinion. It will be accorded brief separate attention herein shortly hereafter.
 After extended and careful study of that factual and legal discussion by the trial judge, the members of this court, as presently constituted, are convinced that he understandingly and correctly arrived at, and declared, the proper judicial conclusion touching the issue of Harry Linch's entitlement to the status of an additional insured under and by virtue of the omnibus clause of Continental's policy of insurance in favor of Petco. And, since that opinion has already been fully reflected verbatim herein, it is believed that, at this point, neither its entire or partial repetition, nor its paraphrased reflection, would serve any practical mission. Only a few pertinent observations respecting it may be in order.
 This court has noted, supra, that one of the reported opinions cited by Chief Judge Arraj in support of the foregoing protective coverage of Harry Linch is Johnson, Drake & Piper, Inc. v. Liberty Mutual Insurance Company (D.C.Minn.) 258 F.Supp. 603, 607. Notice is, therefore, also taken that, since the submission to this court of the present litigation, and on March 8, 1968, that case, upon appeal, was reversed by the United States Court of Appeals, Eighth Circuit, Liberty Mutual Insurance Company v. Johnson, Drake & Piper, Inc., et al (8 Cir.) 390 F.2d 410 (advance sheets). In the United States District Court, it had been held in that case that, where, in the course of the construction of a building's roof of mixed concrete, one insured contractor had prepared and brought to the site of the structure in its own ready-mix trucks, a quantity of mixed concrete, and there had poured the ready-mix concrete into buckets, which, being thus filled, through the use of a crane, and by another contractor (which had purchased such concrete from the insured delivering contractor) were taken into possession and transported to the roof site where the concrete was to be poured into its destined location, and on the occasion in suit the crane, so laden, on its journey from its receipt of the concrete carrying bucket, had fallen with its cargo, with resultant severe injury to an employee of one of the other contractors on the job, through the tipping of the bucket transporting the concrete by use of the crane and bucket from the insured contractor's ready-mix truck to the building roof being poured, the initiated crane carriage constituted "unloading" within the unrestrictive "loading-Unloading clause" of the there operative automobile liability policy; and the parties participating in the operation when the bucket tipped and struck the employee were persons using the vehicle within the language of the policy defining the "insured" as including any person using the automobile, and were entitled to coverage as omnibus insureds. But upon appeal, the United States Court of Appeals, Eighth Circuit, in furtherance of an express determination and declaration that, "Here * * the unloading was completed under Minnesota law when Shiely," i. e. the initially carrying contractor, supra, "permitted the concrete to pour by force of gravity at the place designated by the consignee," namely where the concrete was thus poured into the buckets, for delivery to the crane operating contractor, reversed the judgment of the district court, and directed that court to dismiss the complaint.
 The reversal just mentioned appears to this court effectively to have eliminated Johnson, Drake & Piper, Inc. v. Liberty Mutual Insurance Company (D. C.Minn.), supra, as a ruling by the United States District Court for the District of Minnesota, potentially instructive, (by reason of its supposed application of Minnesota law) to the Chief Judge of the United States District Court for the District of Colorado, in his pursuit of an answer to the then undetermined question concerning the attitude towards the problem before him, which would probably be adopted by the Supreme Court of Colorado. For Chief Judge Arraj was appropriately endeavoring to foreshadow the likely course of the highest tribunal of his own state, in very proper part, by the recollection of the rulings of the courts of sister states upon cases comparable to the one before him.
 However, Chief Judge Arraj arrived at his answer to the issue thus submitted to him, not on the basis of the opinion in the Johnson, Drake & Piper, Inc. case, supra, as controlling upon him (for it was not so controlling), but rather on the balance of observed general authority on the subject, within which that case then appeared to be one of several instructive deliverances. Nor may the circumstance be disregarded that the Johnson, Drake & Piper, Inc. case, in its factual setting, involved a misadventure that occurred in the course of an arguably distinct and secondary operation by a subsequent contractor, the purchaser of the involved cement, which movement occurred after the actual physical delivery of such cement by the insured contractor, as seller of the cement to its purchaser, a subsequent contractor, for use in the constructional project.
 In its submission to this court of the instant appeal, Continental, as appellant, seeks consideration of two opinions of separate Courts of Civil Appeals of the state of Texas. They are Travelers Insurance Company v. Employers Casualty Company (Court of Civil Appeals, Austin, 1960) rehearing denied 335 S.W.2d 235 (not 355 S.W.2d 235 as indicated in the citing brief), and Travelers Insurance Company v. Employers Casualty Company (Court of Civil Appeals, Dallas, 1963), rehearing denied 370 S.W.2d 105. Thus cited as two cases, they are really two separate and successive opinions in the same case, a declaratory judgment proceeding. The earlier opinion arose out of the defendant's tender in the court of institution, the 98th District Court, Travis County, by the then corporate defendant of a plea of privilege to be sued in Dallas County, its corporate domicile. The later opinion arose upon appeal by the plaintiff from a judgment of the District Court of Dallas County, on the merits, in favor of that defendant, after the transfer of the case to that court, supra. Underlying the action involved in those opinions were earlier suits for damages caused by the deaths of three employees of a general contractor on a construction project, who had been killed by the collapse of a crane owned and being operated by Borders Steel Erection Company, a sub-contractor. Still another sub-contractor, Capitol Aggregates, Inc., under a contract also, directly with the general contractor, had prepared a quantity of ready-mix concrete and, in one of its own motor trucks, transported that concrete to the construction site, and there, by means of a chute at the rear of its truck, caused the concrete to flow down into a bucket attached to a crane, both bucket and crane being owned and operated by Borders Steel Erection Company, which was the concrete sub-contractor on the job, under a contract between it and the general contractor, but which had no contractual or other relationship with Capitol Aggregates, Inc. The concrete thus deposited, and the containing bucket, were thereupon by Borders Steel Erection Company, through the use of its crane, taken up for the purpose of transporting the concrete to the point of its permanent introduction into the structure within the project. In the course of the moving of the concrete laden bucket, the crane collapsed, resulting in the deaths of the three employees of the general contractor. The beneficiaries of the three men thus killed brought suit against Borders Steel Erection Company for damages, and their claims were, by Travelers Insurance Company, the insurer of Borders Steel Erection Company, settled for the aggregate sum of $61,020.30.
 Thereupon, Travelers Insurance Company instituted the suit in Travis County, Texas, against Employers Casualty Company, the insurer of Capitol Aggregates, Inc., under a standard automobile liability policy on its cement trucks, insuring Capitol Aggregates, Inc. and any other person while using such trucks with consent of Capitol Aggregates, Inc., against liability. In that suit, Travelers Insurance Company, as plaintiff, sought a declaratory judgment that primary coverage of the accident, supra, was afforded under the policy, by Employers Casualty Company issued to Capitol Aggregates, Inc., because, allegedly, that policy covered the use of the trucks of Capitol Aggregates, Inc., while loading and unloading. The parties litigant therein agreed that the payment of $61,020.30 was a reasonable settlement. In the earlier ruling in that case by the Court of Civil Appeals, Austin, 335 S.W.2d 235, such court, considering that in the District Court's ruling granting Employers Liability Company's plea of privilege, and its demand for trial in Travis County, the District Court had, by necessary implication — though not expressly — held that the truck had been completely unloaded within the meaning of the Employers Casualty Company policy prior to the time when the crane collapsed, refused to reverse or disregard that implicit finding and affirmed. The Supreme Court of Texas thereupon refused to grant a writ of error, and announced that action by a notation judicially held by that court to mean "that though the Supreme Court may not have agreed with everything said in the opinion of the Austin Court of Civil Appeals, it did agree that the judgment of the Court of Civil Appeals was correct." In the later trial, without a jury, on the merits of the case in the District Court of Dallas County, "judgment was rendered in favor of Employers, that Travelers take nothing by its suit." On appeal, the Court of Civil Appeals, Dallas, affirmed; and in its opinion, 370 S.W.2d 105, stated after a brief allusion to the "complete operation theory" and the "coming to rest theory," that it was of the opinion that "under the particular circumstances of this case we must hold that the unloading of Capitol's truck had been completed before the accident occurred, therefore the judgment should be affirmed. We base our conclusion on four grounds, which we shall now state." And the court proceeded to state those grounds. Briefly recalled, those asserted four grounds were (1) the conviction that that Court of Civil Appeals was bound by the holding of the Texas Supreme Court when it declined to grant a writ of error in 335 S.W.2d 235, (in the light of the ambiguity of the ground of that declination, a view even then only doubtfully admissible, and now, in consequence of appellate reversal, unallowable, vide infra); (2) the exhibition of some judicial confusion in the application of the "coming to rest theory" and the "ultimate destination theory;" (3) the position that coverage under the "loading and unloading" provisions of the policy required "some causal connection" between the loading or unloading and the accident, undoubtedly a correct view, if the phrase, "causal connection" be rationally administered; and (4) again, "[i]f there is a fact question involved in this case (we do not say there is) we must uphold the implicit finding of the Austin Court of Civil Appeals and the trial court here that Capitol's unloading process had been completed when the accident occurred." Without attributing any decisional significance to the circumstance now mentioned, it is simply observed that to the prevailing opinion in Volume 335 S.W.2d 235, supra, there was a dissenting opinion by one Justice, and that to the prevailing opinion in 370 S.W.2d 105, one Justice, in a concurring opinion, signified reservations on his part as to most of the several grounds assigned in the prevailing opinion in support of its ruling.
 But, after the deliverance on June 28, 1963 of the opinion in Travelers Insurance Company v. Employers Casualty Company, (Court of Civil Appeals, Dallas) 370 S.W.2d 105, and the denial on July 26, 1963 of rehearing therein, supra, an appeal in that case was taken to the Supreme Court of Texas. Whether any appeal to that state's Supreme Court was concurrently, or otherwise formally, taken in Travelers Insurance Company v. Employers Casualty Company (Court of Civil Appeals, Austin) 335 S.W.2d 235, after the earlier denial by the Supreme Court with a writ of error in that case, supra, does not clearly appear from any showing or legal literature within the present awareness of the writer of this opinion. However, it is noted that the Texas Supreme Court, in the course of its ruling on appeal from 370 S.W.2d 105, made an apparently identical ruling in 335 S.W.2d 235, infra, thus apparently treating that ruling as pending in the Supreme Court on appeal. In any event, the Supreme Court of Texas, in its determination of the appeal, or appeals, then before it, (a) acknowledged that, at the time of its denial of a writ of error in 335 S.W.2d 235, supra, it had entertained the "opinion that the policy issued by Employers did not protect Borders" Steel Erection Company, but then declared that "upon further consideration and in the light of the additional authorities now cited by the parties, we have concluded that Borders was covered by the automobile policy under the facts of this case;" (b) to borrow the Supreme Court's own language, declared:
 "The issue here is not who owned or controlled the concrete but whether Borders was unloading the truck, and thereby using it, while the bucket full of concrete was being moved from the truck to the contractor's forms. If Capitol had rented or borrowed the crane and bucket, and its employees were using the same to unload the truck, the automobile liability policy would clearly protect Capitol and its employees against liability arising out of the accident involved in this case. Under the terms of the policy, the same protection is afforded Borders who was an additional insured using (unloading) the truck with the consent of Capitol."
 and (c) entered its dispositive order that "the judgments of the courts below * * be reversed and the cause remanded * * * for a new trial" (note the pluralizing of "judgments" and "courts").
 By way of its ultimate solution, therefore, that litigation resulted in the reversal by the Supreme Court of Texas of the rulings of the Texas Courts of Civil Appeals theretofore reported in 335 S.W.2d at page 235, and in 370 S.W. 2d at page 105 respectively. Accordingly, in the present appeal to this court, the citation of those opinions of the Courts of Civil Appeals arising under the law of Texas does not persuasively serve Continental's purpose in their submission. As reflections of the law of a state other than Colorado, they were never controlling in this Colorado litigation upon the United States District Court for the District of Colorado. And their reversal by the Supreme Court of Texas dissipated any persuasiveness or instructiveness for the purposes of this litigation which they, or either of them, might theretofore have possessed.
 At this juncture, it appears to be in order to recall a further feature of the opinion just cited of the Supreme Court of Texas, which has practical pertinence to a point urged upon this court by Continental in the instant case. In Travelers Insurance Company v. Employers Casualty Company (Texas) 380 S.W.2d 610, at page 614, the Supreme Court of Texas, responsive to an issue tendered in that litigation, said:
 "Employers also relies on the rule that there must be a causal relation or connection between the accident or injury and the ownership, maintenance or use of the vehicle. This does not mean that the accident must be caused by negligent operation of the vehicle or some defect therein. When a vehicle is being unloaded it is being used to the same extent as if it were being driven, and the person doing the unloading is entitled to the same protection as the owner or operator. In this instance the accident resulted from the collapse of the crane which was transporting concrete from the truck to the forms. Since the injuries arose out of the use (unloading) of the vehicle, it is our opinion that Borders was, as a matter of law, entitled to the protection afforded by the policy covering the truck."
 The paragraph just quoted may well be regarded, along with the discussion of the same subject in his opinion by Chief Judge Arraj, touching the case now before this court, as reflective of the law upon the subject of causal relation or connection, as administered in the present context by the highest court of an important one of Colorado's sister states. It points to the possible and not improbable likelihood of the eventual formal adoption of a comparable view by the highest court of Colorado.
 Chief Judge Arraj, in his opinion quoted herein, supra, dealt at length with the thought underlying the view expressed in the exerpt just quoted from 380 S.W.2d 610, 614. His discussion in that respect is not again repeated here. But it is in order to recall his quotation with approval of two sentences from the opinion in St. Paul Mercury Insurance Company v. Huitt (6 Cir.) 336 F.2d 37, 43, wherein the majority of the court for the sixth circuit, though granting that, in a situation of the present character, there must be a causal relation between the unloading and the accident, emphasized the generally, though probably not invariably, accepted judicial view that, "the question is not whether the insured truck was the cause of the accident." While there is judicial authority challenging the view thus signified, that view appears to be rooted in the more rational and largely accepted segment of judicial opinion.
 Moreover, the admitted and acknowledged facts in this litigation, whereby Chief Judge Arraj's opinion was, and this court's ruling must be, governed, seem to this court emphatically to demonstrate the certainty of a causal connection between the unloading operation and the injuring explosion. The present situation is not one wherein there had been a completed unloading from a vehicle and the deposit of an object which was then, or thereafter, taken over by a destined recipient, and by him started on a further movement during which an actionable misadventure occurred. As has been observed, even in those instances, the proceeding recipient is frequently held to have been a participant in the antecedent, though connected, unloading, probably as an earlier phase of an integrated operation, but is not invariably so found.
 However, in the instant setting, the requisite causal connection was inescapably present. Continental's insured, Petco, had sold and undertaken to deliver some six thousand gallons of liquid gasoline to Fireman's Fund's insured, Harry Linch, such delivery to be made by Petco at the Standard Service Station of Harry Linch. In furtherance of the sale and engagement, Petco had initiated and partly completed the delivery which was being effected through the introduction, by means of hose connections, of the gasoline into the underground gasoline storage tanks of Harry Linch at such station.
 Those tanks were, themselves, equipped with a venting system designed for the purpose, in material part, of conducting the vaporous fumes of gasoline generated by the pouring of the gasoline during the progress of its introduction into the storage tanks, or even by the presence of such gasoline in the tanks after its complete deposit. The vents in that venting system, at their lower extremities, originated in firm and permanent connections with the storage tanks, extended therefrom to the outside of the service station building, and thence, proceeded upward along the side of that building to the roof line. In a practical way, therefore, the vents were parts, or projections, of the tanks themselves, and served their function in consequence of that relation. Supportive of that statement is the following language excerpted from the agreed Statement of Facts:
 "The venting system was an integral part of the storage tanks and was a necessary instrument for the unloading of liquid gasoline into the underground storage tanks, and for the storage thereof, since it served to disperse and dissipate fumes which could and did develop from unloading operations."
 It therefore follows that the very introduction of the gasoline into the storage tanks, introduced them, as well, into the venting system for the performance of its function of the elimination of explosive vapor.
 Liquid gasoline is a familiar, flammable, and volatile fluid. In consequence of its "volatility," (whose Latin derivation signifies "the capacity to fly"), it is recognized as readily vaporizable, that is to say, convertible into vapor. Vapors are frequently identified as "fumes." Indeed, the terms are commonly used interchangeably. But, derivatively, a "fume" signifies a "smoke;" whereas, a "vapor," although broad enough in comprehensiveness to be attributed to any diffused matter suspended floating in the air, and thus to include what is commonly known as "smoke," is more generally understood to be a foglike and moisture bearing substance. In any event, the vapor arising from a quantity of gasoline in the underground storage tanks would ordinarily rise through available channels or otherwise, according to the law of gravity. By architectural design, the vented tanks in the Standard Service Station here involved were so to have been constructed that the unclosed upper extremities of the vents would be above the building's roof line and were thereby expected to provide channels through which the vapors which should emanate from the gasoline, within, or being introduced into, the storage tanks, would rise to the top of, and above, the vents thus above the roof, and be dispersed, and dissipated harmlessly through the air. But, as actually constructed and maintained and operated, those vents were terminated beneath the building's gutter surrounding the top of the building, thus beneath its roof line, and conducted the vapor only to their upper and outletting extremities, after which the vapor sought its own destinations. And some of it was collected into a part or parts of the service station, including, on the presently vital occasion the toilet room. In offering the foregoing statement respecting the actual installation of the vents, this court does not attribute actionable negligence in their construction, maintenance or employment, to any one. It is not, on these appeals, a litigated issue.
 A final factual observation is in order at this point. Once the introduction of the gasoline into the vented storage tanks was initiated, and during the progress of its introduction, the emanation and rising, from such fluid of gasoline laden vapor, and its eventual diffusion began, and proceeded by the operation of the laws of nature without human intervention other than the continuance towards completion of the deposit in the vented tanks of the gasoline then in the way of delivery.
 As the agreed stipulation of facts, and Chief Judge Arraj's opinion, together, make inescapably clear, "the explosion was caused by gasoline fumes" (or vapors) "which arose from the unloading operation" and occurred "while the gas" (i. e., the gasoline) "was still being unloaded," emphasis added. The agreed stipulation of facts by the parties-litigant themselves puts those quoted statements into this verbiage;
 "After Glunz had gone into the rest-room, * * * and while Petco was still unloading the liquid gasoline, he lit a match for the purpose of lighting a cigarette and an explosion occurred whereby he sustained injuries," (emphasis added);
 and
 "It is admitted by the parties hereto that the explosion was caused by the gasoline fumes which arose from this unloading operation." (emphasis added).
 Before leaving this subject, this court, without needless discussion, signifies its agreement with Chief Judge Arraj in his manifestly correct conclusion that Mason v. Celina Mutual Insurance Company (Colo.) 423 P.2d 24, is not presently in point and does not reflect an opinion by the Supreme Court of Colorado that the admittedly required "causal connection" already discussed herein must possess the stature of "proximate causation." The Colorado court in the Mason case, in language which it saw fit to italicize, held that there the death of one of three boys, all permissively seated in a parked and completely unmoving automobile, wherein they had shortly theretofore ridden to the point of stoppage, as guests of another boy, the son of the vehicle's owner, after which time, the boy who was killed, came to his death in the parked vehicle when he was struck by a bullet from a pistol with which its owner, another of the three boys in the automobile, was "toying," "did not arise out of a covered use of the automobile," and in support of that conclusion declared that, "Here no causal connection between the discharge of the pistol and the stopped vehicle was shown, as is required to afford coverage under such a policy." That ruling arose out of a third party proceeding against the insurer of the owner of the automobile in a suit brought by the father of the deceased boy against the boy who had been toying with the death dealing weapon. It is to be observed that the Supreme Court of Colorado did not reach at all the issue of proximate causation, but rather disposed of the third party proceeding upon the finding that "no causal connection" had been shown, and, upon the authority of 7 Appleman, Insurance Law and Practice, section 4317, at page 146, that "the accident must have arisen out of the inherent nature of the automobile as such in order to bring one within the terms of such a policy." The Mason case is simply not in point in the present controversy.
 This opinion might be expanded in substantial measure by the presentation of a more detailed analysis of the reported opinions cited by Chief Judge Arraj in support of his ruling upon the subject of the availability to Harry Linch of insurance coverage under the omnibus clause of Continental's policy in favor of Petco, and of the admitted succession, through the right of subrogation, by Fireman's Fund to the benefit of such coverage, if any, of Harry Linch. It might be even more widely expanded by the submission of an adequately exhaustive study of the entire reported judicial response to that issue. But it is considered by this court that any such expansion would be unwarranted and largely ostentatious. The succession through subrogation to such coverage, if any, as Harry Linch possessed is unequivocally stipulated, supra. The trial judge's memorandum opinion, as has already been said herein, discloses his adequate and essentially correct study of many of the pertinent authorities, with his conclusions wherefrom, this court has hereinbefore signified its agreement. This court, therefore, should, and does, simply reiterate and confirm its agreement upon that issue with Chief Judge Arraj. Let it be understood that the agreement of this court with the trial court's ruling upon the issue of Harry Linch's coverage under Continental's policy in favor of Petco extends to that court's citation of decisional authorities not explicitly identified and discussed herein, except through the inclusion, in this ruling, of the entire language of the trial court's memorandum opinion.
 Next encountered is Continental's contention that coverage under its policy issued to Petco must be denied to Harry Linch through the application to the facts of the present case of the exclusionary clause of that policy, which appears in the policy after, and as a part of, its definition of the phrase "insured under the policy," and is in this language:
 "The insurance with respect to any person or organization, other than the named insured does not apply:
 * * * * * *
 "(b) to any person or organization, or to any employee thereof, operating an automobile sales agency, repair shop, service station, storage garage, or public parking place with respect to any accident arising out of the operation thereof." (emphasis added)
 In the trial court's memorandum opinion, supra, the question thus tendered was stated, considered and decided in that portion of such opinion which is within its twenty-first and its twenty-seventh unnumbered paragraphs, both inclusive. By way of ready identification, the twenty-first paragraph contains a single spaced copy of the lately quoted, and presently vital, portion of the policy's exclusionary clause; and the twenty-seventh paragraph consists of slightly more than three typed lines and constitutes, in a single sentence, the trial judge's declaration of his conclusion and ruling upon the question. With that aspect of the trial court's opinion and its underlying reasoning, this court entirely agrees.
 One may allow himself to doubt whether, strictly speaking, Phoenix Assurance Company of New York v. Ocean Accident and Guarantee Corporation, 145 Colo. 26, 357 P.2d 642, judicially declares the validity and effectiveness, under Colorado's law, of the precise exclusionary clause which is involved in this instance, with the directness and clarity which Chief Judge Arraj appears to perceive in that opinion. But the court, in the Phoenix Assurance case, administered it, either recognizing or assuming its validity. And no question is presently advanced upon that score. For the purpose of this appeal, it is, therefore, recognized as valid. There remains, however, the serious question of its applicability and consequence, if any, in the present factual setting. In passing, it is to be remembered that a policy of insurance, notoriously composed unilaterally by, or in behalf of, the corporate insurer for hire, is to be construed liberally in favor of the bestowal of supposed coverage, but strictly as against the contended exclusion of coverage, on occasions in which one or both of those problems may be advanced.
 Reverting to the excepting verbiage, and to the factual setting of this litigation, the trial judge was confronted with the question, first, whether, at the time of the explosion and injury in suit, Harry Linch was a "person * * * operating an automobile * * * service station," and secondly, whether the explosion, with its injury to Glunz, was an "accident arising out of the operation thereof." To the first aspect of that question, Chief Judge Arraj correctly made an affirmative answer. So long as no more was asked, it was surely true that Linch was operating a gasoline service station. But that alone did not bar his protective coverage by insurance. To that consequence, it was imperative that the injury in suit be the result of an "accident arising out of the operation of the service station." And that question, Chief Judge Arraj answered negatively, as this court understands, and correctly, as this court is convinced. His brief, but pointed, reflection of "the purpose and rationale" underlying the presence in motor vehicle liability policies of "the exclusionary clause," with his supportive citation of Dixie Automobile Insurance Corporation v. Mason (Fla.App.) 155 So.2d 172, and, so far as his quotation therefrom extends, of Buxton v. Randel, 159 Kan. 245, 154 P.2d 129, 131, are also believed to be well considered. Obviously correct also were his declaration that "the unloading process here involved was part of the operation of Petco, the gasoline supplier, rather than the operation of the service station," and his citation in support of that view, of the comparable case of Insurance Company of State of Pennsylvania v. Palmieri et al., 81 N.J.Super. 170, 195 A.2d 205 (with the cases therein cited). This court fully agrees with his "conclusion that the exclusionary clause was not designed to avoid liability in a case like the present one, and it will therefore not be given that effect."
 Without more, it is held that the cited exclusionary clause is inoperative to defeat the protective coverage of Harry Linch under the terms of Continental's policy issued to Petco.
 Continental next contends that the trial court erred in not holding that Fireman's Fund's policy was primary to that of Continental. This subject is treated in the trial Court's memorandum opinion in the twenty-eighth, twenty-ninth and thirtieth unnumbered paragraphs thereof. In those paragraphs the trial judge points out the pertinent language of the involved policies and discloses the reasoning which led him to his conclusion that, in respect of the coverage under Continental's policy provided in the instant context for Harry Linch, such coverage was primary, and the insurance afforded by the endorsement upon Fireman's Fund in its policy issued to Harry Linch was not primary, but was "excess insurance over any other valid and collectible insurance available to" Harry Linch. Again, this court regards that phase of the trial court's memorandum as soundly conceived, and by this reference adopts it.
 What has just been advanced touching the primary status of the insurance afforded to Harry Linch under Continental's policy appears to this court to be similarly pertinent to Continental's position that the trial court erred in not holding that, as to the claim of Glunz against Harry Linch involved in this litigation, Continental's policy was excess insurance to that of Fireman's Fund. This court, therefore, considers that contention of Continental to be invalid.
 Next noted is Continental's position that the trial court erred in not granting Continental's motion for summary judgment. From the totality of the discussion hereinbefore advanced, it must be and is concluded that this point is not well taken.
 Continental insists that the proper remedy to be pursued by Fireman's Fund would have been the institution of a declaratory judgment proceeding. To that contention it may be, and correctly by the trial judge has already been, responded that while Fireman's Fund, in quest of the relief to which it considered itself to be entitled, might, indeed, have sought a declaratory judgment in vindication of its position, it was under no obligation so to proceed. The remedy by way of a declaratory judgment is not exclusive; nor is its pursuit, even if available, mandatory.
 Nor may it be considered, as Continental contends, that, by Fireman's Fund's participation in the settlement of, and entry of the judgment for $5,000.00 in Case No. 20151 in the District Court of Jefferson County, Colorado, Fireman's Fund was a volunteer with the consequence that it was and is barred from recovering herein. The details of Fireman's Fund's participation in such settlement, and in the entry of judgment in furtherance thereof, and in the payment of such judgment, have already been disclosed at length and need not be, and are not, repeated. It is concluded by this court, as it was concluded and declared by the trial court, that such participation, settlement and payment, especially in the light of the timely communication between Fireman's Fund and Continental incident thereto, supra, are completely inadequate, either entirely or separately, to fasten the character of a volunteer upon Fireman's Fund. As the trial judge clearly found upon cited authority, and declared, a volunteer is a stranger, or intermeddler, with no interest to protect. It will at once be recognized that, in its plight, at the critical time, Fireman's Fund having undertaken, in Case No. 20151, the defense of Harry Linch against the demand of Chris Eugene Glunz in the circumstances already set out, was not in any sense a volunteer, a stranger, or an intermeddler. The contrary contention of Continental is, therefore, rejected.
 Attention is directed finally to No. 9509, wherein, by way of cross appeal, Fireman's Fund asserts that the trial court erred in denying that portion of the claim for relief sought by Fireman's Fund pertaining to costs and expenses and attorney's fees, in the aggregate sum of $6,946.57, by it incurred in the defese of case No. 20151, in the District Court of Jefferson County, Colorado, wherein Chris Eugene Glunz was plaintiff and Harry Linch and others were defendants.
 It is to be understood that by stipulation of the parties to this appellate proceeding, it has been agreed that those items in that aggregate sum are reasonable in amount, and were necessarily incurred in the defense of Case No. 20151 in the District Court of Jefferson County, Colorado. The declaration of that stipulation is by this court accepted as conclusive.
 In his memorandum opinion in Civil Action No. 66-C-90 in the United States District Court for the District of Colorado, Chief Judge Arraj dealt directly with that portion of Fireman's Fund's demand in the thirty-third unnumbered paragraph of such opinion, beginning with the sentence, "The only remaining issue is whether plaintiff is entitled to recover the attorney's fees and costs incurred in the defense of Linch in the original action," and continuing through the thirty-seventh unnumbered paragraph, whose final clause is, "but that plaintiff is not entitled to the attorney's fees and costs incurred in the defense of Mr. Linch."
 In such memorandum opinion, the trial court first quoted from the policy of Fireman's Fund the covenant:
 "The company," i. e. Fireman's Fund, "will pay, in addition to the applicable limits of liability:
 (a) All expenses incurred by the company, all costs taxed against the insured in any suit defended by the company."
 The trial judge also announced the unquestioned finding that Fireman's Fund defended Harry Linch in accordance with its obligation, and added the altogether accurate statement, "but there has certainly been no showing that it incurred any greater costs in defending than it would have had (if) defendant (had) assisted in the defense," citing Great Atlantic and Pacific Tea Company v. Pepsi-Cola Bottling Company, (D.C.Ill.) 209 F.Supp. 629, wherein, at page 633, significance was attributed to such an omission.
 The trial judge, further and accurately emphasized, from the foregoing quotation in Fireman's Fund's covenant, that:
 "The obligation to defend is completely separate from the obligation to pay any judgment ultimately rendered against the insured and the defense responsibility is not affected by the plaintiff's (i. e. Fireman's Fund's) `other insurance' provision. Although plaintiff's liability is for excess coverage over and above any other collectible insurance, the obligation to defend is not so limited." (citing West American Insurance Company v. Allstate Ins. Co. (10 Cir.) 295 F.2d 513, 515, and United States Fidelity and Guaranty Company v. Tri-State Insurance Company (10 Cir.) 285 F.2d 579, (mistakenly attributed to page 529,) and American Fidelity and Casualty Company v. Pennsylvania Threshermen and Farmers Mutual Casualty Insurance Company (5 Cir.) 280 F.2d 453.
 It is observed here, first, that in supposed support of the last quoted language of the memorandum opinion citation was also made of Financial Indemnity Company v. Colonial Insurance Company, 132 Cal.App.2d 207, 281 P.2d 883. Attention is, therefore, directed to the fact that, in another, and later case, Continental Casualty Company v. Zurich Insurance Company, 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455, and as of December 20, 1961, therefore, more than five years before that citation which occurred on April 3, 1967, the Financial Indemnity Company case was, by the Supreme Court of California, cited and expressly "disapproved." This court, therefore, regards its citation in this case by the trial judge as inadequate in and of itself to lend any practical support to the position in aid of which it was thus cited. However, that circumstance does not nullify the other citations upon the question by the trial judge.
 Beyond the foregoing brief gleaning from the lately identified paragraphs of the memorandum opinion directly pertinent to the issue tendered in the cross appeal of Fireman's Fund, this court now recalls the complete language of those paragraphs as earlier herein quoted verbatim, and does so without their repetition.
 Concluding the trial court's discussion of the claim of Fireman's Fund in that behalf, the trial judge in such opinion announced the trial court's denial of the demand of Fireman's Fund for reimbursement, either entirely or partially, on the score of the items of attorney's fees, costs and expenses.
 In addition to the authorities already cited herein, this court presumes to recall as supportive of the trial court's determination, in respect of the denial of Fireman's Fund's demand for reimbursement on account of attorney's fees, costs and expenses, among other cases that might be advanced for that purpose, Maryland Casualty Company v. American Family Insurance Group of Madison, Wisconsin, 199 Kan. 373, 429 P.2d 931.
 It is here recognized that in various courts within the United States, including courts of final resort, there exists reported authority divergent from that relied upon by the trial court. Applying the language of the insurance policies before them, some of those courts have allowed complete reimbursement of defense expense, while others have directed equal or other proportionate sharing of such expense. In this situation, wherein the Supreme Court of Colorado has not determined its position upon the question involved, in an obvious and acknowledged effort to come upon the course which that state's Supreme Court may reasonably be expected to follow, Chief Judge Arraj has arrived at and expressed his conclusion, adverse in this particular, to Fireman's Fund.
 This court is convinced that the conclusion and judgment of the trial court upon the subject of reimbursement, either entirely or partially, of Fireman's Fund on account of the defense expense incurred by it, are correct. And it is especially convinced that in the context of its decision the trial court upon that subject arrived at, and adopted, a legally permissible and allowable conclusion, and that such conclusion was, and is, supported and sustained by substantial evidence. And in default of a controlling local determination upon the subject, the trial court's conclusion should be accepted upon appeal, where there is no compelling indication of a contrary local rule. The trial court's present action in that setting should be sustained. Mitton v. Granite State Fire Insurance Company (10 Cir.) 196 F.2d 988; West American Insurance Company v. Allstate Insurance Company (10 Cir.) 295 F.2d 513; Dallison v. Sears, Roebuck and Company (10 Cir.) 313 F.2d 343; Pendergrass v. New York Life Insurance Company (8 Cir.) 181 F.2d 136, 137, 138; Dierks Lumber and Coal Company v. Barnett (8 Cir.) 221 F.2d 695, and cases cited therein; Wisconsin Screw Company v. Fireman's Fund Insurance Company (7 Cir.) 297 F.2d 697; Brimhall v. Simmons (6 Cir.) 338 F.2d 702.
 Accordingly, the cross appeal of Fireman's Fund, in No. 9509, is denied, and the judgment of the trial court denying recovery by Fireman's Fund for attorney's fees, costs and expenses by it incurred in the defense of Harry Linch in Civil Action No. 20151 in the District Court of Jefferson County, Colorado in the sum of $6,946.57, or any part thereof, is affirmed.
 It is, therefore, considered and ordered that the judgment of the United States District Court for the District of Colorado in Civil Action 66-C-90 therein be:
 Affirmed.